344 F.2d 860
 COURTESY CHEVROLET, INC., a corporation, Appellant,
v.
TENNESSEE WALKING HORSE BREEDERS' AND EXHIBITORS'
ASSOCIATION OF AMERICA, a corporation, J. H. Amos, S. W.
Beech, Jr., U. French Brantlet, Ed. S. Ezell, Sr., W. F.
Fessey, W. V. Garnier, W. W. Gill, C. C. Turner, and J.
Glenn Turner, Appellees.
 No. 19385.
 United States Court of Appeals Ninth Circuit.
 May 3, 1965.
 
 1
 Henry F. Walker, Hansen & Dolle, Victor R. Hansen, Joseph T. Thompson, Los Angeles, Cal., for appellant.
 
 
 2
 George E. Danielson, Los Angeles, Cal., Clarence Evans, James Evans, Farris, Evans & Evans, Nashville, Tenn., for appellees.
 
 
 3
 Before BARNES and HAMLIN, Circuit Judges, and PENCE, District Judge.
 
 
 4
 PENCE, District Judge.
 
 
 5
 The plaintiff-appellant in this private antitrust suit has appealed from an order granting the defendants' motion to quash service and to dismiss for lack of venue. From the record, it appears that the Tennessee Walking Horse Breeders' and Exhibitors' Association of America (Association) is a Tennessee general Welfare corporation with its only office at Lewisburg, Tennessee, and with its objectives:
 
 
 6
 '* * * to collect, record and preserve the pedigrees of the strain of horses known as the Tennessee Walking Horses, wherever located, and the publication of a Register in such form as shall be adopted by the Association, and such other matters pertaining to the breeding, exhibiting and sale of the strain of horses known as the Tennessee Walking Horses as may be deemed advisable.' (By-Laws, Article II.)
 
 
 7
 The Association is the only one in the United States in which the Tennessee Walking Horses may be registered as such. Without such registration a horse cannot compete in Tennessee Walking Horse shows, and no foal of any unregistered Tennessee Walking Horse may be registered as a Tennessee Walking Horse. The Association's by-laws permit the registration of Tennessee Walking Horses by non-members of the Association, as well as members, but at a different charge. Initial membership fees and annual membership dues are required to be paid by each member.
 
 
 8
 The Association receives at and sends from Lewisburg, Tennessee, through the mail, 'papers pertaining to the pedigree, registration and transfer' of Tennessee Walking Horses, and makes and receives charges for this service. The services in regard to pedigree papers, registration and transfer papers is the most substantial part of the Association's business.
 
 
 9
 The Association collects and disseminates information concerning the breed to its members throughout the United States, sending eleven newsletters per year to each of its members. Its by-laws provide that in the exhibition and judging of all Tennessee Walking Horses, the Rules and Regulations promulgated by the Judges and Judging Committee of the Association shall be the official rules by which all such horses are to be exhibited and judged. (Articles XIV and XV). The by-laws also provide for regional vice-presidents to be elected by members of the Association, who shall not be eligible to serve as members of the board of directors but shall perform such duties as they are called upon to perform by other officers and the board of directors-- in order to develop a group of persons having proven interest and experience in the affairs of the Association from whom can be selected the future leaders of the Association. (Article VIII).
 
 
 10
 At the time this suit was filed and service was made upon him, Dwain Clark, a Los Angeles attorney, was California Regional Vice-President.
 
 
 11
 There are approximately 100,000 Tennessee Walking Horses registered with the Association, and of the 1,771 members of the Association as of December 1963, 67, or about four per cent, had California addresses. Appellees' counsel at argument assumed that one-half of these were in the Southern District of California. There are approximately 150 owners of Tennessee Walking Horses in California and six major Tennessee Walking Horse breeders and stables are in Southern California.
 
 
 12
 In 1950, the Association issued a 'Charter of Affiliation' to the Tennessee Walking Horse Breeders' Association of California. No charge was made for this, nor do either the Association or the California Association contribute financially to each other. The California Association has collected dues for both itself and the Association.
 
 
 13
 The Association's executive secretary attended two horse shows in California in 1959 and one in each of the years 1961, 1962 and 1963, two of which were in the District of Southern California. It paid travel expenses and supplied a judge for the Walking Horse classes in the 1961 and 1963 Southern California horse shows.
 
 
 14
 In April 1963, the executive secretary of the Association, H. Tom Fulton, wrote to Mr. Paul Raines of Memphis, Tennessee, giving him a guest card to judge the Sacramento show and in the letter ridiculed and disparaged the California exhibitors and their shows. This letter came to the attention of R. M. McClure, president of the appellant corporation and also then the Regional Vice-President of the California District, who instantly raised a complaint on behalf of the California exhibitors. Mr. Amos, chairman of the board of directors of the Association on June 21, 1963, wrote McClure that the board would hear a complaint concerning the Fulton letter on July 13, 1963, at the Association's office in Lewisburg, Tennessee. The letter was not properly addressed and was never received by McClure. On July 1st, Amos sent a telegram to McClure quoting the contents of the June 21st letter. On July 2nd, McClure wired back that the July 13th date was unacceptable because it was the first day of the Santa Barbara Horse Show, one of the Tennessee Walking Horse 'point shows' which California exhibitors were expected to attend, and asked that a different date and place of hearing be granted. On the same day, Amos answered by telegram that the board of directors would meet to hear the complaint on July 13th and they expected McClure to be present.
 
 
 15
 McClure did not go to Tennessee on that date and by letter dated July 15, 1963, the Association notified the appellant that it had voted to deny the appellant, and McClure as its agent, the services of the Association because of McClure's failure to appear and prosecute his complaint. This letter was amplified by another letter of August 5, 1963, to appellant's counsel, wherein Amos stated that the appellant was denied the services of the Association, 'which means all and any services that the Association can render it's members, including the registration or transfer of horses, or showing before its Judges. * * *'
 
 
 16
 Meanwhile, on July 24, 1963, appellant forwarded applications for registration of three foals and on August 9th appellant was notified by the Association that the applications were being held for attention at a later time, as was action on the certificate of registration and transfer for a horse to appellant.
 
 
 17
 As of October 1963, appellant owned approximately 27 Tennessee Walking Horses with an average value of between $5000-$6000. Eight horses of the breed were being trained and boarded at appellant's stables and appellant's principal breeding stallion who serviced from 12 to 24 mares per year commanded a stud fee of $150 per service. The annual payroll of the stables was $49,800. Appellant alleged that the Association had complete monopoly over the registration and transfer of the breed and that it refused and denied this service to the appellant. Thus appellant was unable to register any of its foals, was unable to sell its yearlings because of inability to produce certificates, and was unable to show its horses.
 
 
 18
 Membership in the Association is a prerequisite to membership in the California Association. Therefore, when, on March 5, 1964, the Association wrote to the California Association, returned a check together with three membership applications, stated that the applications were not on a proper form, enclosed 'National Association Membership Forms' to be used by the California Association for new members, advised that two named persons had paid their dues to the Association, stated that the Association would not accept the dues tendered for the appellant, Courtesy Chevrolet, Inc. corporation and added 'that Mr. McClure and the Courtesy Chevrolet Company's membership is under suspension at this time (and) therefore, he cannot be considered as a director of your group nor could we accept dues from him at the present time for the Courtesy Chevrolet Company,' the California Association thereupon removed McClure from his position as a member of the California Association board of directors. Thereafter, too, all horses owned by the appellant were disqualified from participating in California High Point Awards in Tennessee Walking Horse shows for lack of membership by appellant in the California Association.
 
 
 19
 This antitrust action was brought in December of 1963 and service of summons and complaint was made on the Association's Regional Vice-President, Dwain Clark, with proper endorsement being made on the summons served in accordance with California Code of Civil Procedure, 410.[1]
 
 
 20
 The Association moved to quash the service of summons and complaint, and to dismiss for lack of venue, which motions were granted by the trial court in April 1964. From those orders, this appeal has been taken.
 
 
 21
 The preceding recitation of facts which were before the district court[2] has been set out in lengthy detail because such is necessary for imposition of the only rule of law which is uniformly applicable to all cases involving venue, viz., the decision depends entirely upon the particular facts involved.
 
 
 22
 The Association does not deny that it is engaged in commerce. Admittedly it is a nation-wide organization having members throughout America, and its services and 'its Judges' are intended, as stated in its by-laws, to promote the 'breeding, exhibiting and sale' of the Tennessee Walking Horses' wherever located.' It acknowledges that about two per cent of its members and six major Walking Horse breeding stables are in the Southern District of California.
 
 
 23
 This being an antitrust action, in order that the District Court for the Southern District of California may entertain the case, it must appear from the record that the Association is either an inhabitant of that district, or has an agent there, or is found, or transacts business therein. 15 U.S.C.A. 15, 22.
 
 
 24
 It is conceded by the Association that the controlling question here is that of proper venue, and if venue is laid in the Southern District of California, the matter of process is of no practical import, because under the Act, service can be made on the Association in Tennessee. 15 U.S.C.A. 22.
 
 
 25
 Appellant agrees that the Association is not an inhabitant of the Southern District of California but urges that not only was the Association transacting business in the district but that it was found in that district by virtue of its Regional Vice-President residing in the district, he being an officer of the Association elected specifically for the purpose of representing the Association's interests in the California region.
 
 
 26
 It is admitted by the appellant that all the Association's income comes from registration and transfer fees and dues of members, received by it in Tennessee. The Association urges that it has conducted no business in the State of California; that all of its acts concerning registration, pedigree and transfer of horse ownership take place in Tennessee. It insists that because its Regional Vice-Presidents under the by-laws are granted no power, authority or duties, except such as may be specially given them by the Association, and none were so given the California Regional Vice-President, he cannot be considered its agent in California. It also insists that the California affiliate is not controlled or dictated to in any way except that a prerequisite to membership in that affiliate is membership, in good standing, in the Association.
 
 
 27
 The narrower question therefore is: Does the record show that the Association was doing business,[3] or was found, within the Southern District of California, within the meaning of the anti-trust laws?
 
 
 28
 The Association urges that its sending of Judges into California for three shows was but a casual courtesy or service of the Association. That this was one of the means by which the Association maintained its powerful status in California is manifest from the letter of August 5, 1963, wherein the Association denied to the appellant the right to show its horses 'before its Judges.' From that statement alone the activity of its judges in california as part of the Association's service might possibly singly meet the minimal requirements of doing business in California.[4]
 
 
 29
 The Association argues, nevertheless, that except for the appearance of its judges at the horse shows and the presence of its Regional Vice-President in California, that all of the Association's contacts with California are made by mail out of its Tennessee headquarters and that these contacts do not measure up to the peculiar situation ruled upon by the Supreme Court in McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).
 
 
 30
 Conceding that the facts here are not on all fours with McGee, such argument, however, ignores the fact that the Association makes its money out of every Tennessee Walking Horse foal that is dropped in California and registered in Tennessee and every horse that is sold in California and transferred on its Tennessee books, and that one of its basic means to promote those registrations and transfers is the exhibition of the breed before 'its Judges', and even more important, it overlooks the fact that even though the Association otherwise operated in California by mail, by mail it deliberately and intentionally brought about in California the very injuries now complained of.
 
 
 31
 As indicated, the letter of April 1963 which the executive secretary of the Association wrote to Raines was intended to, and did, affect only the California exhibitors of the Tennessee Walking Horses. It was calculated to affect the reputation, commercial value, stud fees and sale of the California show horses. Furthermore, the letters of July 15 and August 5, 1963, from the Association to the appellant unequivocally were intended to, and did, deny to the appellant all of the services of the Association, 'including the registration or transfer of horses, or showing before its Judges. * * *' These letters were intended to, and did, foreclose the appellant from carrying on its Tennessee Walking Horse breeding and sale business in California. This unilateral act of denying the services of the Association to the appellant, even though made in Tennessee, was intended to, and did, have its primary effect in the Southern District of California.[5]
 
 
 32
 By its acts emanating out of Tennessee, the Association thus deliberately and directly: (1) prevented the appellant in the Southern District of California from registering any foals dropped by appellant's horses-- thus practically preventing any sale of the same to potential Tennessee Walking Horse buyers in the California or any other market; (2) by refusing to register the transfer of Tennessee Walking Horses to the appellant, stopped appellant's normal and substantial trade in the same in the California or any other market; and (3) ruled out any possibility that appellant's horses might be shown before 'its (the Association's) Judges', thus making sure that appellant's stables were completely out of show competition-- in California where appellant's horses had been show winners.
 
 
 33
 Although the appellant in California had violated none of the Association's 'rules' save that of disagreeing with the executive secretary and the board of directors and failing to appear in Tennessee when arbitrarily ordered to-- acts not forbidden by any of its by-laws-- nevertheless the Association denied to it in California as well as Tennessee, even services normally and regulary given to non-members.
 
 
 34
 If more evidence of the Association's 'transaction of business' in California were necessary, it is supplied by the action of Association in directing and causing the California affiliate not only to drop the appellant corporation from its membership but likewise to drop McClure, appellant's president, from his office as a director of the affiliate.[6]
 
 
 35
 While only one act may be enough to fulfill the venue requirements of the statute,[7] in each case it is the totality of all of the facts which determines whether the defendant is doing business, or found, in a district.[8] Here, not alone was two per cent of the Association's total membership found in the district;[9] not alone did a Regional Vice-President reside in the district; not alone was an affiliate found there; not alone did the Association repeatedly send 'its Judges' into the state and district to implement an essential objective of the Association;[10] but, added to all of those facts, the Association deliberately undertook to and did wield its power in California to directly and substantially affect the commerce in Tennessee Walking Horses in that state. The sum of all of these facts added up to doing business in the state and district within the broad concept and objectives of 15 U.S.C.A. 22, and the taking of jurisdiction by the district court would be consistent with the words and intent of the antitrust acts. Here certainly, there have been "such contacts of the corporation with the state of the forum as to make it reasonable * * * to require the corporation to defend the particular suit which is brought there.' International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, at 317, 66 S.Ct. 154, 90 L.Ed. 95. Here, the acts done in California, 'because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit.' Id. at 318, 66 S.Ct. (154) at 159.'[11] Similar to the holding of this court in Mechanical Contractors,[12] we here also 'think that the totality of the facts shown by this record satisfies the three tests laid down by us in L. D. Reeder Contractors of Arizona v. Higgins Industries, Inc., 9 Cir., 1959, 265 F.2d 768, and Kourkene v. American B.B.R. Inc., 9 Cir., 1963, 313 F.2d 769. There has been the doing of some act, or the consummation of some transaction, within the forum.'[13] We conclude that the claims of the appellant arise out of or result from just such acts and transactions.
 
 
 36
 Having determined that the Association was transacting business in the Southern District of California, it is unnecessary for us to Determine whether the Regional Vice-President was the Association's 'agent' in California or that through him the Association is 'found' there.
 
 
 37
 Although, as agreed to by the Association, once venue is found to lie in the Southern District of California the matter of service becomes of minor import, we think that the service of process upon the Association's Regional Vice-President was sufficient. There is no contention that the Association did not have immediate and adequate notice of the suit or sufficient time to prepare its pleadings and appear. 'The rationale of all rules for service of process on corporations is that service must be made on a representative so integrated with the corporation sued as to make it a priori supposable that he will realize his responsibilities and know what he should do with any legal papers served on him.'[14]
 
 
 38
 It is to be noted that this court is not holding that every national non-profit association is subject to suit in any state in which it has members or affiliates or happens to have an officer residing there.[15] We do but again say that the salient law on the question of venue, viz.: its determination depends upon the precise facts before the court, will be applied to each case coming before us.[16]
 
 
 39
 It must at all times by remembered that this case is still only at the pleading stage; we are not considering its merits; and nothing that we have said herein is to be construed as indicating we believe the Association's acts were necessarily proscribed or that the appellant has a good cause of action against the Association. All that we hold is that, on the record before us the Association's activities in California were such as to fulfill the minimal requirements for venue, in this antitrust action, to lay in the Southern District of California, and that service of process was properly made upon the Association there.
 
 
 40
 The basis of the district court's decision that venue would not here lie, does not appear from the record. Our own findings demand reversal and it is so ordered.
 
 
 
 [1]
 The suit as filed named all of the directors of the Association as defendants, and service on them was attempted by serving Clark. Appellant confesses that the district court correctly granted the motions to dismiss the action and quash the service of summons and complaint as to the individuals. This court, therefore, does not concern itself with that problem
 
 
 [2]
 Hearing on the motions to quash service and dismiss for lack of venue was held on February 24, 1964. Thereafter an affidavit was filed by McClure, with copies to defendants' counsel, setting forth additional alleged facts pertinent to the disposition of the motions. Defendant immediately filed a motion to strike the same, with which was attached a letter of defendants' counsel to plaintiff's counsel dated March 24, 1964, which likewise contained additional 'facts.' Appellees have objected to this court considering any of the matters contained in McClure's affidavit or defendant's letter
 The transcript of the hearing of April 20, 1964, when the district court granted the defendant's motion to quash service and dismiss, shows the following:
 'Mr. Hansen: (Appellant's counsel) * * * I assume the court has had an opportunity to see the affidavit that we filed. * * * 'The Court: Yes. I have also seen the one in support of the motion to strike. * * * 'The Court: * * * All I know is * * * the impression I get from the affidavits, which could be wrong. If the matter would ever come back to me * * * you might find it easy by showing the other facts to change my mind. * * *'
 It thus appears that the court did not strike plaintiff's affidavit but considered the 'facts' stated in it, as well as those contained in defendant's letter of March 24th. This court has done likewise, and the above outline of pertinent facts includes some set out in both the affidavit and letter. Cf. Johnson v. Banducci, 212 Cal.App.2d 254, 260, 27 Cal.Rptr. 764.
 
 
 [3]
 Eastman Kodak Company v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1926)
 
 
 [4]
 Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)
 
 
 [5]
 Cf. United States v. Scophony Corp., 333 U.S. 795, 808, 68 S.Ct. 855, 92 L.Ed. 1091 (1948)
 
 
 [6]
 Cf. Mechanical Contractors Association of America, Inc. v. Mechanical Contractors Association of Northern California, Inc., 342 F.2d 393 decided February 8, 1965. (9th Cir.)
 
 
 [7]
 E. D. Reeder Contractors of Arizona v. Higgins Industries, Inc., 265 F.2d 768 (9th Cir. 1959)
 
 
 [8]
 Travelers Health Ass'n v. Com. of Virginia ex rel. State Corp. Comm., 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950)
 
 
 [9]
 Brandt v. Renfield, 278 F.2d 904 (8th Cir. 1960)
 
 
 [10]
 Yonce v. Miners Memorial Hospital Ass'n, 161 F.Supp. 178 (D.C.W.D.Va.1958)
 
 
 [11]
 Mechanical Contractors, see note 6, supra
 
 
 [12]
 Ibid
 
 
 [13]
 Ibid
 
 
 [14]
 19 C.J.S. Corporations 1312, p. 995. See also, Koninklijke Luchtvaart Maatschappij v. Curtiss-Wright Corp., 17 F.R.D. 49, 51 (D.C.S.D.N.Y.1955)
 
 
 [15]
 Cf. Elizabeth Hospital, Inc. v. Richardson, 167 F.Supp. 155 (D.C.W.D.Ark.1958); Wentling v. Popular Science Publishing Co., 176 F.Supp. 652 (D.C.M.D.Pa.1959); Midwest Fur Producers Ass'n v. Mutation Mink Breeders Ass'n, 102 F.Supp. 649 (D.C.D.Minn.1951)
 
 
 [16]
 Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952)