**GRAPPONE, INC.**

v.

**SUBARU OF AMERICA, INC., and Subaru of New England, Inc.**

Civ. A. No. 74–119.

United States District Court,
D. New Hampshire.

Nov. 12, 1975.

**126**

Howard B. Myers, Ingram & Myers, Hanover, N.H., for plaintiff.

John C. Ransmeier, Sulloway, Hollis, Godfrey & Soden, Concord, N.H., for defendant Subaru of America.

John W. Barto, Orr& Reno, Concord, N.H., for defendant Subaru of New England.

## OPINION

BOWNES, District Judge.

Plaintiff, a New Hampshire corporation, is a retail automobile dealer engaged in the business of selling new and used Subarus to the consuming public. Defendant Subaru of America, Inc. (Importer), a Pennsylvania corporation having its principal place of business in Pennsauken, New Jersey, is the sole importer and manufacturer's distributor of Subaru motor vehicles in the United States. Defendant Subaru of New England, Inc. (Distributor), a Massachusetts corporation having its principal place of business in that State, is the regional wholesale distributor of Subarus for the New England area.[1]

Plaintiff's complaint contains five separate causes of action. Counts I and II allege violations of the Sherman Antitrust Act, 15 U.S.C. § 1, as amended, and Section 3 of the Clayton Act, 15 U.S.C. § 14, in that the defendants have forced the plaintiff to purchase a "parts kit" and a "substantial amount of" advertising services as a condition to receiving any Subaru automobiles. Plaintiff alleges that the "parts kit" was developed by Importer and Manufacturer and that it "consisted of a number of parts, including various items that are occasionally used by Subaru dealers, a number of parts that are rarely if ever replaced on Subaru automobiles, and a number of parts which are available to Subaru dealers from other sources." (Pl's. Complaint, Count I ¶ 12 at 6.) In addition, plaintiff alleges that these advertising services have been of little or no benefit. Plaintiff alleges that it refused to purchase these "services" from the defendants and, as a consequence, was denied the opportunity to sell Subarus in 1974, thereby causing it a loss in revenues. Counts III and IV allege violations of the Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq., and reiterate the factual allegations which support the antitrust claims. Count V alleges that Distributor has "failed to act in good faith in performing and complying with the terms of plaintiff's dealer agreement in that it has coerced plaintiff into paying freight charges in excess of actual freight charges incurred" and that this conduct constitutes a violation of the Dealers Day in Court Act (Act). (Pl.'s Complaint ¶ 6 at 29.)

Plaintiff seeks both injunctive relief and monetary damages.

Importer has moved to dismiss Counts I and II on the ground that, under 15 U.S.C. § 22, venue in this district is improper. Importer seeks to dismiss

---

1. The New England area, as defined in the contract, comprises the States of New Hampshire, Vermont, Maine, Massachusetts, Rhode Island, and Connecticut.

Counts III, IV and V on the ground that this court cannot, consonant with the due process clause of the Fourteenth Amendment, exercise personal jurisdiction over it. In addition, both Importer and Distributor move to dismiss Counts III, IV and V on the grounds that (1) they are not automobile manufacturers as defined in 15 U.S.C. § 1221(a) and this court, therefore, lacks subject matter jurisdiction over them, and (2) venue in this court, under the Act, is improper.

It is clear that Count V of the complaint does not apply to Importer. So that there will be no confusion on this point, it is hereby ordered that Count V be dismissed as against Importer.

### ISSUES

1. Whether Importer "transacts business" in New Hampshire as defined in 15 U.S.C. § 22;

2. Whether this court has personal jurisdiction over Importer;

3. Whether Importer or Distributor is a "manufacturer of automobiles" as defined in 15 U.S.C. § 1221(a);

4. Whether venue in this court is proper under the Dealers' Day in Court Act.

### FACTS

The facts not covered here will be treated as part of the legal analysis.

Subaru automobiles and parts are manufactured in Japan by Fuji Heavy Industries, Ltd., a Japanese corporation. (Manufacturer) Manufacturer has granted Importer the exclusive right to import Subarus into the United States, Puerto Rico, and the Bahama Islands. (Pl.'s Ex. 1 at 2.) Prior to this grant to Importer, Fuji did not export or distribute Subarus to America.

When Importer first commenced its operations, it accomplished the wholesale distribution of Subaru vehicles and parts through a wholly-owned subsidiary, Subaru of Pennsylvania, Inc.

In 1970, Importer changed its legal method of distribution by abolishing the wholly-owned subsidiary and establishing fourteen independently owned regional distributorships and one other distributorship in which it presently retains an ownership interest. (Stipulation No. 7)[2]

The general method of operation and distribution now works as follows: (1) Manufacturer sells the vehicles to Importer FOB Japan; (2) Importer ships the vehicles to various ports of entry where they are sold to the regional distributor; (3) the regional distributor, in turn, determines at the port of entry how the cars are to be distributed amongst the retail dealers; (4) after the regional distributor has allocated the cars to the various retail dealers, the dealers then transport the vehicles, via common carrier, from the port of entry to their showrooms where they are offered to the public.

Distributor is the regional distributor for the New England area and Importer has no ownership interest in it. It is Distributor's responsibility to recruit prospective retail dealers who will sell directly to the public.

### VENUE UNDER 15 U.S.C. § 22

Venue in a private antitrust action against a corporation is governed by 15 U.S.C. § 22 which provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

The law provides that a corporation is an inhabitant of the state of its

---

2. There are fifteen regional wholesale distributorships; Importer has retained an

ownership interest in the distributorship for southern California and Nevada.

incorporation. *Aro Manufacturing Co. v. Automobile Body Research Corp.*, 352 F.2d 400 (1st Cir. 1965), *cert. denied*, 383 U.S. 947, 86 S.Ct. 1199, 16 L.Ed.2d 210 (1966). Importer is not incorporated in New Hampshire and, therefore, not an inhabitant of this State.

■■■ The term "found" refers to activities which are "continuous and local." *Stern Fish Co. v. Century Seafoods, Inc.*, 254 F.Supp. 151, 153 (E.D. Pa.1966); *Fox-Keller, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 338 F.Supp. 812, 815 (E.D.Pa.1972). In order to be "found" within this district, a corporation must be present by "its officers and agents carrying on the business of the corporation." *Aro, supra*, 352 F.2d at 404. Importer does not have any officers or agents within this district who engage in "continuous local activity." I, therefore, find that Importer· is not "found" in this district. The tests which determine whether a corporation is "found" within a district, however, are more stringent than those which are used to determine whether it "transacts business." The phrase "transacts business" provides "a much broader meaning for establishing venue" than the word "found." *United States v. Scophony Corp.*, 333 U.S. 795, 807, 68 S.Ct. 855, 861, 92 L.Ed. 1091 (1948). The question is whether Importer "transacts business" within this district.

Under Section 7 of the original Sherman Antitrust Act of 1890, a defendant could only be sued in the district in which it "resides or is found." *People's Tobacco Co. v. Am. Tobacco Co.*, 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587 (1918).

■■■ In enacting the Clayton Act, which supplemented the former laws against unlawful restraints of monopolies of interstate trade, Congress chose to expand a plaintiff's choice of venue by adding the phrase "transacts business." By choosing this language, Congress intended to broaden the venue re-quirement so as to give an aggrieved plaintiff "the right to bring suit and have it tried in the district where the defendant had committed violations of the Act and inflicted the forbidden injuries." *United States v. Nat. City Lines*, 334 U.S. 573, 583, 68 S.Ct. 1169, 1175, 92 L.Ed. 1584 (1948); *Eastman Co. v. Southern Photo Co.*, 273 U.S. 359, 373–374, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Scophony, supra*, 333 U.S. at 807, 68 S.Ct. 855. As a consequence of Congress' action, "[t]he practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character' became the test of venue." *Scophony, supra*, 333 U.S. at 807, 68 S.Ct. at 862. What constitutes "transacting business" for venue purposes under the antitrust laws must be decided by examining the particular facts involved and "an appraisal of the unique elements of a particular situation." *Rhode Island Fittings Co. v. Grinnell Corp.*, 215 F.Supp. 198, 200 (D.R.I.1963); *Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Ass'n*, 344 F.2d 860, 863 (9th Cir. 1965); *Aro, supra*, 352 F.2d at 403. *See generally*, Note, Venue in Private Antitrust Suits, 37 N.Y.U.L.Rev. 268 (1962).

■■■ In assaying the facts, the court should bear in mind that the broadening of the antitrust venue provision "was designed to aid plaintiffs by giving them a wider choice of venues, and thereby to secure a more effective, because more convenient, enforcement of antitrust prohibitions." *United States v. Nat. City Lines, supra*, 334 U.S. at 586, 68 S.Ct. at 1176. Nevertheless, the burden is on plaintiff to prove that venue in New Hampshire is proper. *Aro, supra*, 352 F.2d at 403.

An examination of Importer's contacts with this State and its relationship with Distributor, therefore, is imperative. The following facts have been stipulated to by the parties:[3]

---

3. Only those stipulations which have been directly· quoted are numerically noted with a "stipulation number."

1. Importer's "mailings, bulletins and materials" are intended for dealer usage and are disseminated by Distributor to retail dealers (Stipulation No. 20);

2. Importer prepares for Distributor "parts and vehicle price lists showing suggested wholesale and retail prices" (Stipulation No. 21);

3. Distributor usually forwards Importer prepared warranty and service manuals to its retail dealers;

4. Distributor recruits and screens prospective dealers;

5. Importer "has formulated a set of standards which new retail dealers ought to meet, and [Importer] has prepared dealer application forms designated to elicit information showing compliance with these standards. These forms are completed by the prospective dealers with the assistance of [Distributor]. The forms are then submitted to [Importer], and if [Importer] finds that the information thereon shows the prospective dealer meets the minimum standards, the distributor may complete the appointment of the new dealer. If the information shows that the prospective dealer is deficient vis-a-vis the minimum standards, [Importer] notifies the distributor and, in the usual case, the dealer must meet the standards before the distributor completes the appointment. In some cases, however, dealers have been appointed although they have not met [Importer's] standards." (Stipulation No. 22);

6. In 1974, Importer urged Distributor to "institute a dealer evaluation review," and, in order to fulfill this directive, Distributor's "district managers visited retail dealers to review their normal operating procedures and to see whether they complied with standards considered appropriate by [Importer]." (Stipulation No. 23);

7. Maurice Gunn, Importer's Development Manager, has frequently advised and assisted Distributor with its managerial operations vis-a-vis the dealers;

8. "Customer warranty claims under the warranty provided by [Importer] are made to the retail dealer, who in turn files them with his distributor on forms designed and supplied by [Importer]." (Stipulation No. 28);

9. Warranty parts, prices and labor rates are determined by Importer and "[c]ertain [Importer] warranty work requires prior approval or inspection, including on-site inspection. Such approval or inspection is carried out by the distributor in accordance with [Importer] policy." (Stipulation No. 30);

10. "A representative from [Importer's] service department visits [Distributor] once a month to discuss and review subjects such as repair or service training, warranty claims, and customer complaints." (Stipulation No. 31);

11. Importer's representatives have visited New Hampshire four times—two of these visits were to attend trade meetings in Concord;

12. The dealership agreement which plaintiff signed was on a form provided by Importer;

13. Importer has used the national media to advertise its product and these advertisements have found their way into New Hampshire;

14. Importer has never imported a vehicle at a New Hampshire port of entry nor has it ever sold a vehicle in this State;

15. None of Importer's officers, directors, or employees reside in this State, use a New Hampshire address or maintain local offices;

16. Importer has never registered as a corporation doing business in New Hampshire;

17. Importer has no real or personal property located in New Hampshire;

18. Importer has never signed any contract with any retail dealer or any wholesale distributor in New Hampshire;

19. Importer neither owns nor controls any stock of Distributor, either directly or indirectly; and

20. No director, officer, or employee of Importer is an officer, director, stockholder, or employee of Distributor.

I find that the only direct physical contacts that Importer has had with this State are three trips to New Hampshire by Gunn and a visit by a regional service manager. Importer has also procured national advertisements which have been disseminated through the media into New Hampshire.

The general standard of law is that isolated and sporadic contacts with the forum state are not sufficient to constitute transacting business; "[t]he business transacted must be of a substantial character, and it must have some degree of continuity." *Bruner v. Republic Acceptance Corp.*, 191 F.Supp. 200, 203 (E.D.Ark.1961); *Stern Fish, supra.*

While some courts have stated that in this area of the law precedent offers "little assistance," *Kolb v. Chrysler Corp.*, 357 F.Supp. 504, 508 (E.D.Wis. 1973); *Yonce v. Miners Memorial Hospital Ass'n, Inc.*, 161 F.Supp. 178 (W.D. Va.1958), I believe it does help to define the outer periphery of the phrase "transacts business."

The four visits to New Hampshire by Importer's representatives are not sufficient to constitute the requisite degree of local contact. *Eastern Pre-Cast Corp. v. Giant Portland Cement Co.*, 311 F.Supp. 896 (E.D.Pa.1970). Nor does the attendance of trade meetings in New Hampshire supply the requisite degree of local activity. *Javelin Corp. v. Uniroyal, Inc.*, 360 F.Supp. 251 (N.D.Cal.1973). "Finally, national advertising which finds its way into a particular jurisdiction is insufficient to support a finding of transaction of business [citations omitted]." *Albert Levine Associates v. Bertoni & Cotti*, 309 F.Supp. 456, 460 (S.D.N.Y.1970) and cases cited therein. Importer's direct contacts with this State are not substantial enough to warrant a finding that it "transacts business" within this district. The question now arises whether Importer transacts business in New Hampshire as a consequence of Distributor's local activities.

It is important to note that Distributor has not filed a motion to dismiss Counts I and II for improper venue. There is no doubt that Distributor transacts business within this district. *Interstate Cigar Co. v. Corral Wodiska y Ca.*, 30 F.R.D. 354 (E.D.N.Y. 1962).

Numerous cases have held that venue may be proper against a foreign parent corporation as a consequence of its subsidiary's local activities. *Waldron v. British Petroleum Co.*, 149 F.Supp. 830 (S.D.N.Y.1957); *Hoffman Motors Corp. v. Alfa Romeo S. p. A.*, 244 F. Supp. 70 (S.D.N.Y.1965). In order for a subsidiary's local contacts to be transferred to its parent, it must be shown that the parent corporation controls the day-to-day business operations of its subsidiary.

Even where the subsidiary corporation was wholly-owned, courts have been unwilling to base venue over the parent "in the absence of a showing that the foreign corporation in fact controlled and managed the subsidiary to subject the foreign corporation to venue in the district." *O.S.C. Corp. v. Toshiba America, Inc.*, 491 F.2d 1064, 1066 (9th Cir. 1974); *Hayashi v. Sunshine Garden Products, Inc.*, 285 F.Supp. 632 (W.D. Wash.1967), *aff'd* 396 F.2d 13 (9th Cir. 1968).

A degree of confusion has pervaded this area of the law. In determining whether venue is appropriate with regard to a parent corporation as a consequence of its subsidiary's activities, many cases have relied on the analysis undertaken in *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). *Toshiba, supra; Hayashi, supra.* The

principles enunciated in *Cudahy* were used as a means of resolving the troublesome question whether the parent exercises "sufficient" control over its subsidiary *for jurisdictional purposes*. But the use of *Cudahy* in an antitrust suit is inappropriate because it did not arise under the antitrust laws. The main issue in *Cudahy* was "whether, at the time of the service of process, defendant was doing business within the state in such a manner and to such an extent as to warrant the inference that it was present there." *Id.* at 334–335, 45 S.Ct. at 250. In determining whether venue is proper in antitrust suit, the question is not one of corporate structure, but rather corporate control. *See, Call Carl, Inc. v. B P Oil Corporation*, 391 F.Supp. 367, 372–373 & n.4 (D.Md.1975).

■■■ In *Hoffman, supra*, 244 F.Supp. at 76, the court stated: "A foreign manufacturer of cars transacts business by promoting the sale of its products through a distributorship system when the manufacturer retains *some control* over the distributor." (Emphasis added.) *See also, Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corp.*, 46 F.2d 623 (1st Cir. 1931). Control is an elusive concept and defies ascertainable standards. In an attempt to define the amorphous, courts look to the "totality of the relationship between the parent and the subsidiary," *Call Carl, supra*, 391 F.Supp. at 371, with the key factor being "the ability of the parent to influence major decisions of the subsidiary which lead or could lead to violations of the antitrust laws." *Id.* at 371. A finding of control should be based on practical and commercial criteria and not by a retreat to highly technical rules. *Sunbury Wire Rope Mfg. Co. v. United States Steel Corp.*, 129 F.Supp. 425, 427 (E.D.Pa.1955). This method of analysis differs sharply with the *Cudahy* approach.

■■■ It is axiomatic that Importer, as the exclusive importer of Subarus into the United States, has optimal control over all wholesale and retail dealers. If Distributor does not follow Importer's advice or suggestions, whether they be implicit or explicit, then it is subject to Importer's power of revocation. The quintessence of control is contained in paragraph 12(f) of the Distributorship Agreement, entered into between Importer and Distributor, which provides that Importer shall have sufficient cause to bring about immediate termination of the agreement as a consequence of "[a]ny disagreement or personal difficulties in the management of Distributor which in Importer's opinion may adversely affect the conduct of Distributor's business." (Pl.'s Ex. 2 at 12.) This provision is so broadly worded that it could justify almost any reason for termination.

In two other cases where there has existed the same inequality in bargaining positions, courts have not been willing to find that this inequity, *ipso facto*, constitutes the requisite degree of control in satisfaction of 15 U.S.C. § 22. *Toshiba, supra; Fox-Keller, supra.* As previously stated, *Toshiba* is distinguishable because the Ninth Circuit erroneously relied on *Cudahy*. In addition, *Toshiba* never addressed itself to the question of control. Any assessment of a parent-subsidiary relationship is meaningless unless there is a detailed factual analysis of the control that the former has over the latter.

*Fox-Keller*, on the other hand, cannot be distinguished and I can only disagree with its holding. In *Fox-Keller*, a retail dealer brought suit against the exclusive importer of Toyotas and a regional distributor. The method of distribution was similar to the one involved in this suit. The importer sold the product to distributor and did not involve itself with the national automotive distribution. The court found that the importer was "clearly not transacting business" in Pennsylvania because it made "no sales directly to distributors or dealers" in that State. *Id.* 338 F.Supp. at 815.

*But see, Sunrise Toyota, Ltd. v. Toyota Motor Co.,* 55 F.R.D. 519 (S.D.N.Y. 1972); *Compare, Dobbins v. Kawasaki Motors Corp., U.S.A.,* 362 F.Supp. 54, 64 (D.Or.1973).

The First Circuit has recognized that "[t]he sale of goods is not essential to constitute transacting business. All the steps leading up to or in promoting sales may constitute the transaction of business." *Jeffrey-Nichols, supra,* 46 F.2d at 625. Importer's protestations that it does not transact business in New Hampshire because it neither sells cars in the State nor ships them into the State to be sold are to no avail if it can be established that it "retains a general oversight and control [over Distributor] under its contract . . . ." *Id.* at 625.

Importer has not entered into any contracts with New Hampshire dealers; Distributor is the corporate entity that corresponds directly with the local retail dealers. But this corporate pyramiding cannot obfuscate the obvious; the retail dealers are the backbone of Importer's business, for it is they who sell cars to the public. The selling of products "is the most important part of a business. There can be a substitute for every department of a business but sales." *Sunbury Wire, supra,* 129 F.Supp. at 427. It is for this reason that Importer has established standards which prospective dealers must meet. The contract entered into between Importer and Distributor is replete with obligations that relate to the promotional activities of the parties.[3] The disposal of Importer's

---

3. A close examination of the distributorship agreement discloses the pervasive control which Importer has over Distributor and its method of operation.

*Article 4*

(4) In the promotion and sale of SA Products, in providing service for SA Products and in all other activities pursuant to this Agreement, Distributor shall give due consideration to all applicable and reasonable directives and suggestions of Importer.

*Article 6*

(1) For its business pursuant to this Agreement Distributor shall use exclusively business forms, including but not limited to contracts of sale with its retail dealers conforming to directives and suggestions of Importer. In addition to the above requirement the agreement between Distributor and any and all of its retail dealers shall be in the form provided from time to time by the Importer, and shall include any supplementary agreements that the Importer may later provide.

\* \* \* \* \*

(3) Distributor shall participate in exhibitions, fairs, rallies or similar events in accordance with the reasonable directives and suggestions of Importer. After participation in any such event, Distributor shall furnish promptly to Importer a written report thereof.

*Article 7*

(1) . . . In the event that the Importer has a reasonable basis to believe that any retail dealer fails to satisfy these requirements the Importer shall notify the Distributor of this fact and in the absence of the Distributor furnishing what the Importer at

his sole discretion believes to be satisfactory evidence to the contrary within two weeks, the Importer's objections shall be deemed to require the Distributor to immediately apply its best efforts to correct the dealer's failure to satisfy the requirements set forth in this paragraph.

*Article 8*

\* \* \* \* \*

(3) Distributor shall not sell or offer to sell for use in connection with Cars any parts other than spare parts supplied by Importer or parts expressly approved by Importer if such parts are a) necessary to the mechanical operation of Cars and b) not equivalent in quality and design to spare parts supplied by Importer or parts expressly approved by Importer, provided that such spare parts are made available to Distributor by Importer.

*Article 9*

\* \* \* \* \*

(14) Distributor shall acquire and at all times maintain at least such minimum inventory of SA Products (not including Cars) supplied to it by Importer as is determined by Importer to be prudent on the basis of the experience of Importer, but this obligation shall be subject to the ability of Importer and of such other sources to supply the products ordered by Distributor.

*Article 11*

(1) Distributor shall use accurate accounting practices reasonably satisfactory to Importer concerning sales, servicing and warranty claims on SA Products to enable Importer to develop comparative data in order, among other things, to furnish to Distributor, for Distributor's benefit, business management assistance concerning SA Products.

products "not only requires reliable distributors and dealers, but frequent oversight and contact with their work, as well as advice and assistance from the home or manufacturer's office and its designers, engineers, and sales managers." *Jeffrey-Nichols, supra,* 46 F.2d at 625; *K. J. Schwartzbaum, Inc. v. Evans, Inc.,* 44 F.R.D. 589, 592 (S.D.N.Y. 1968). Based on the foregoing, I find that Importer has sufficient control over the essential business activities of Distributor and that it, therefore, "transacts business" within this district. Venue is proper.

■■■ I also believe that venue is proper under 28 U.S.C. § 1391(b) which allows for a federal claim to be brought in the judicial district "in which the claim arose."

The special antitrust venue statute is supplemented by the general venue statute. *Philadelphia House Auth. v. American Radiator & S. San. Corp.,* 291 F. Supp. 252, 257 (E.D.Pa.1968). Because the general venue statute allows for the action to be brought "in the district in which the claim arose, venue can be laid in such a district despite the fact that it would not meet the requirements of the special [antitrust] venue provisions." 1 Moore's Federal Practice ¶ 0.144[14.–15] at 1562.

Plaintiff alleges that, as a direct consequence of defendants' unlawful conduct, it has been precluded from selling Subarus in New Hampshire and thereby has lost revenue which it would have earned but for defendants' activity. This injury has occurred in the State of New Hampshire. In *Philadelphia Hous. Auth.,* the court rejected the mechanical test of "place of injury" when determining "where the claim arose" for antitrust venue purposes and adopted the "weight of the contacts test." *Id.* at 260–261.

■■■ I agree that, in determining where the claim arose, courts should use the weight of the contacts test, but I also feel that the place of injury should

be given great weight and consideration by the court; a failure to give "heavy" weight to the place of injury would enable a foreign corporation to make policy decisions in a distant state which violate the antitrust laws, and yet force the aggrieved party to travel to the wrongdoer's home district to litigate the suit. *Arnold v. Smith Motor Co.,* Brookfield, Mo., 389 F.Supp. 1020, 1023–1024 (N.D. Iowa 1974). *Cf. Electric Theater Co. v. Twentieth Century-Fox F. Corp.,* 113 F. Supp. 937, 940 (W.D.Mo.1953), where the court stated:

> Although none of the defendants were ever licensed under Kansas law to transact business in that State, nevertheless plaintiff's business, and the damage sustained as a result of the monopoly charged, both took place within the confines of that State. 15 U.S.C.A. § 15, expressly provides that recovery for anti-trust law violations is to be given to any person thereby "injured in his business or property". Since, therefore, plaintiff's private right of action necessarily accrued when, and only when, it was injured in its business or property, it follows that the right of action here asserted "originated" where said business or property was located, viz., in Kansas. Even though proof of conspiracy is a fundamental burden which plaintiff must assume, the fact that such conspiracy, if true, took place outside of Kansas does not preclude a finding that plaintiff's cause of action originated in Kansas. Plaintiff's cause of action is not derived from the mere conspiracy charged, but from the damage proximately resulting therefrom.

I find that the claim arose in this judicial district and that venue against Importer is proper under 1391(b).

## PERSONAL JURISDICTION

F.R.C.P. 4(d)(7) authorizes extraterritorial service under state law even when the claim arises under federal law. *Seymour v. Parke, Davis & Co.,* 294 F. Supp. 1257, 1259 (D.N.H.1969), *aff'd.*

423 F.2d 584 (1st Cir. 1970); *Wolfe v. Doucette*, 348 F.2d 635 (9th Cir. 1965).

The New Hampshire "long-arm" statute provides in pertinent part:

> Whenever any foreign corporation authorized to transact, or transacting business in this state shall fail to appoint or maintain in this state a registered agent upon whom service of legal process or service of any such notice or demand may be had, . . . the secretary of state shall be and hereby is irrevocably authorized as the agent and representative of such foreign corporation to accept service of any process or service of any notice or demand required or permitted by law to be served upon such corporation. NH RSA 300:11(c).

In *Roy v. North America Newspaper Alliance*, 106 N.H. 92, 205 A.2d 844 (1964), the New Hampshire Supreme Court held that the New Hampshire "long-arm" statute is to be interpreted to the fullest extent permissible under the due process clause of the Fourteenth Amendment.

■ In assaying the jurisdictional facts, this court is guided by two principles:

> First, the exercise of jurisdiction has to be reasonable from the standpoint of New Hampshire's interest in the litigation. Second, it has to be consistent with principles of fair play and substantial justice. *Leeper v. Leeper*, 114 N.H. 294, 296, 319 A.2d 626, 628 (1974).

■ In *Roy v. Transairco, Inc.*, 112 N.H. 171, 176, 291 A.2d 605, 608 (1972), the Court stated that, in viewing jurisdictional contacts, courts should be "committed to the realistic treatment of the problem of jurisdiction over foreign corporations." Courts should assess both the quantitative and qualitative aspects of a foreign corporation's jurisdictional contacts. *See*, Note, Nonresident Jurisdiction and the New England Experience, 48 B.U. L.Rev. 372, 395–402 (1968).

When deciding whether the extension of jurisdiction would violate "judicial notions of fair play and substantial justice," courts should inquire "whether defendant could have reasonably anticipated that its activities would have an effect" in this jurisdiction. *Mulhern v. Holland America Cruises*, 393 F.Supp. 1298, 1303 (D.N.H.1975). If Importer has mandated that all Subaru dealers must purchase a "parts kit" as a prerequisite to their obtaining cars for sale, then surely it knows that its policy decision will have an impact on New Hampshire dealers. *Cf. Sanders Associates, Inc. v. Galion Iron Works & Mfg. Co.*, 304 F.2d 915 (1st Cir. 1962). In addition, the right of New Hampshire citizens to institute local suit "in quest of injuries committed here," *Libbey v. Hodgdon*, 9 N.H. 394, 396 (1838), is given heavy weight when contacts are weighted on the jurisdictional scale. *Property Owners Association v. Sholley*, 111 N.H. 363, 365, 284 A.2d 915 (1971). The harm which plaintiff has allegedly suffered has occurred in this State.

■ Moreover, I have previously found that Importer controls the essential business decisions and operations of Distributor and that this control is sufficient to constitute "transacting business" for venue purposes. Although the two tests are different, I find that the qualitative impact of Importer's jurisdictional contacts requires a finding that it is "transacting business" in New Hampshire as defined in NH RSA 300:11(c).

SUBJECT MATTER JURISDICTION UNDER THE DEALERS DAY IN COURT ACT: IS IMPORTER AN "AUTOMOBILE MANUFACTURER" AS DEFINED IN 15 U.S.C. § 1221(a)?

■ The moving force behind the passage of the Dealers Day in Court Act was Congress' recognition "that the bargaining power of the manufacturer vis-a-vis the dealer is so great that the terms of any franchise agreement can be

dictated virtually in their entirety by the manufacturer." *Barney Motor Sales v. Cal Sales, Inc.*, 178 F.Supp. 172, 174 (S.D.Cal.1959). The Act is an attempt to equalize the dramatic economic advantage that automobile manufacturers have over their dealers. *See Hanley v. Chrysler Motors Corp.*, 433 F.2d 708, 710 (10th Cir. 1970) and cases cited therein. The Act created a new cause of action by granting to an "automobile dealer" the right to bring suit against an "automobile manufacturer" on an allegation that the manufacturer failed "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

A review of the legislative history discloses that when Congress passed the Act, it was not concerned and did not consider the situation presented in this case: the foreign manufacturer of automobiles who relies upon an "independent" importer to distribute and market its product. 1956 U.S.Code Cong. and Admin.News, at p. 4597. In 1956, when the Act was passed, foreign car manufacturers did not have a ready and eager American market; the Act was concerned solely with the economic power that domestic manufacturers exercised over domestic retail dealers.

When engaging in definitional statutory interpretation, a court usually gives a word its ordinary and common meaning. If, however, the statute provides its own definition, then that definition is controlling. *Western Union Telegraph Co. v. Lenroot*, 323 U.S. 490, 503, 65 S.Ct. 335, 89 L.Ed. 414 (1945); *National Labor Relation Board v. Coca Cola Bottling Co.*, 350 U.S. 264, 76 S.Ct. 383, 100 L.Ed. 285 (1956). 15 U.S.C. § 1221(a) defines automobile manufacturer as follows:

The term "automobile manufacturer" shall mean any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles.

■ In view of Congress' intent and the Act's remedial purpose, courts have broadly interpreted the phrase "automobile manufacturer" so that:

When the instrumentality used to exact onerous conditions of continuing in the automobile retailing business is "acting for" the manufacturer in the sense that he is employed by the manufacturer willingly or unwillingly to bring about the condition of subservience aimed at in the Act, we are of the view that the instrumentality is itself a part of the manufacturer bound by the Act's requirement of good faith. *Barney Motor, supra*, 178 F.Supp. at 175.

*See also, Volkswagen Interamericana, S. A. v. Rohlsen*, 360 F.2d 437, (1st Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966); *DeCantis v. Mid-Atlantic Toyota Distributors*, 371 F.Supp. 1238 (E.D.Va.1974). The First Circuit has stated that, in view of the Act's remedial purpose, an "automobile distributor" will be found to be an "automobile manufacturer" when the "distributor is subject to the manufacturer's control." *Volkswagen, supra*, 360 F.2d at 441.

■ The question of control is a difficult one. In resolving the issue of control, courts should look to the relationship between the manufacturer and the dealer and ask whether the *manufacturer* is using the distribution chain as a means of imposing its will on the *dealer*. In other words, are Importer and Distributor intermediary bodies "through which the will of the manufacturer is expressed"? *Barney, supra*, 178 F.2d at 175. But the fact that Manufacturer exerts control over a portion of

Importer's business is not dispositive of the issue; the control must be over Importer's relationship *vis-a-vis the retail dealers. DeCantis, supra,* 371 F.Supp. at 1242. Courts must bear in mind that the Act was "aimed at automobile manufacturers, not at distributors, as such, and that the inclusion of certain distributors in section 1221(a) was designed only to prevent a manufacturer from circumventing its responsibilities under the act by transacting business with its dealers through alter egos." *Volkswagen, supra,* 360 F.2d at 441.

It is with this observation in mind that the following facts must be evaluated: (1) Importer has never manufactured or assembled Subaru vehicles or its parts; (2) Importer has the exclusive right to import Subarus into the United States; (3) Importer can appoint as many subdistributors and dealers as it deems desirable (Distributorship Agreement entered into between Manufacturer and Importer, (Art. 11 ¶ 1, Pl.'s Ex. 1)); (4) the appointment of these distributors and dealers must be periodically reported in writing to Manufacturer (*Id.* Art. 11 ¶ 1); (5) Importer is continually obligated to purchase from Manufacturer a minimum number of Subarus per year (*Id.* Art. 4); (6) Importer is responsible to see that its distributors and dealers "maintain adequate and sufficient showrooms" (*Id.* Art. 11 ¶ 2); (7) Importer "should make every reasonable effort to see that every [Subaru] owner . . . receives prompt reliable and expert service and advice, and that repairs are carried out with care and efficiency" (*Id.* Art. 11 ¶ 3); (8) Importer is to require its distributors and dealers "to collectively keep at all times a stock of spare [Subaru] parts and accessories" (*Id.* Art. 11 ¶ 4); (9) Manufacturer maintains a liaison staff of four persons at Importer's headquarters; and (10) Manufacturer has played no role in either dealer recruitment, evaluation or review.

A conflict exists presently as to whether a finding of "control," under the Act, must be premised on agency principles.

The Ninth Circuit in *Stansifer v. Chrysler Motors Corp.,* 487 F.2d 59, 64–66 (1973), held that the manufacturer-distributor relationship was "one of buyer and seller" rather than principal-agent, and as a result, the distributor could not be found to be an "automobile manufacturer." In the absence of an agency relationship, the court was unwilling to clothe the distributor in manufacturer's clothing. In *Volkswagen,* the First Circuit stated:

"Acts for and is under the control of * * * *" describes with equal aptness the relation between certain agents and their principals. A manufacturer can exercise the same kind of control through contractual provisions with a stranger as it can by owning and directing a subsidiary corporation, and evasion of its responsibilities by either method would equally undermine the purposes of the act. We believe the provision in question should be interpreted in the context of general agency law. It is sufficient that the distributor "is subject to the [manufacturer's] * * * control or right to control." Restatement (Second), Agency, § 220(1) * * * *Id.* 360 F.2d at 441.

*Stansifer* was criticized in *DeCantis,* where the court cited *Volkswagen* for the proposition "that the relationship between the manufacturer and distributor" need not "rise to the stature of principal and agent" in order to find that the manufacturer exerted the requisite degree of control over an importer or distributor. *DeCantis, supra,* 371 F. Supp. at 1244 & n.7.

 There is no doubt that Importer utilizes a special expertise when it markets and distributes Subarus. In addition, the testimony of Mr. Lamm, President of Importer, and the contractual agreement entered into between Manufacturer and Importer indicate that the control exercised by Manufacturer is not sufficient to establish an

agency relationship. *Stansifer, supra,* 487 F.2d at 65; *cf. Arnson v. General Motors Corp.,* 377 F.Supp. 209, 212–213 (N.D.Ohio 1974). I do not believe, however, that a failure to establish an agency relationship is dispositive of the issue.

■ As the court recognized in *DeCantis,* "it is the seat of power which the Act is intended to ultimately affect, not the medium through which it is exercised." *Id.* 371 F.Supp. at 1242. An "organizationally controlled middleman" is the forging element which can establish a chain of control "through which the will of the manufacturer is expressed." *Barney, supra,* 178 F.Supp. at 175. And while the purposes of the Act cannot be avoided by the imposition of an independent, but controlled middleman, the fact that such a middleman exists, does not, *ipso facto,* create the requisite chain of control. *Cf. Tom Sullivan Porsche Audi Co. v. SCU Industries Inc.,* 342 F.Supp. 738 (E.D.Mich.1972). This case places us on the cutting edge of when an importer becomes subject to the Dealers Day in Court Act.

Unlike *DeCantis,* Importer is not a wholly-owned subsidiary and the record discloses that Importer has been given wide discretion to establish a nationwide network of distributorships and dealerships. But as plaintiff's exhibits 4, 7, 11, 14, 17, and 18 indicate, Manufacturer has an interest in the manner and method by which Subarus are marketed. There is no doubt that Manufacturer desires the efficacious and expeditious distribution of its product. To argue, as defendants have, that Manufacturer is concerned solely with the manufacturing of the product and that it has little or no interest in the method of distribution is to flout both common sense and the evidence. This does not mean, however, that Manufacturer's interest in the distribution process constitutes control over the dealers. The burden is on plaintiff to establish that Importer's relations with its dealers are subject to Manufacturer's direct control. While plaintiff has introduced evidence that Manufacturer and Importer work closely together, it has failed to establish the requisite degree of control in the specific area of "dealer relationships." The evidence discloses that Importer, not Manufacturer, sits in the "seat of power" when it comes to dealer relations.

■■ It is interesting to note that Congress has been willing and able to regulate specifically the conduct of foreign car importers in other areas of the law. Both 15 U.S.C. § 1231(a) (Disclosure of Automobile Information) and 15 U.S.C. § 1391(5) (Motor Vehicle Safety Statute) include in their definition of a "manufacturer," *"any person importing"* automobiles for sale. (Emphasis added.) If the proscriptions of the Dealers Day in Court Act are to apply to an importer solely because it is ultimately dependent upon a foreign car manufacturer, then Congress should so provide. Congress is able to move swiftly and amplify existing legislation when it deems it necessary. *Cf.* Public Law 94–83 which was passed in response to *Conservation Soc. of S. Ver., Inc. v. Secretary of Tran.,* 508 F.2d 927 (2d Cir. 1974), *vacated,* —— U.S. ——, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975). Solicitude for the remedial purposes of the Dealers Day in Court Act is not a substitute for legislation.

After a close examination of the facts, I find that "the ultimate reins of control over retail dealer operations," *DeCantis, supra,* 371 F.Supp. at 1243, are not in Manufacturer's hands, but are held by Importer. I therefore rule that Importer is not an "automobile manufacturer" as defined in 15 U.S.C. § 1221(a).

It is hereby ordered that Counts III and IV against Importer be dismissed for lack of subject matter jurisdiction. It logically follows that if Importer is not a manufacturer within the confines of the Act, then Distributor cannot be

and Distributor's motion to dismiss Counts III, IV and V for lack of subject matter jurisdiction is granted.

· In writing this opinion, I am aware that "there is substantial ground for difference of opinion" on two legal grounds: (1) whether venue in this court is proper under 15 U.S.C. § 22, and (2) whether Importer or Distributor is an "automobile manufacturer" as defined in 15 U.S.C. § 1221(a). I believe that the final resolution of these questions will "materially advance the ultimate termination of this litigation." I, therefore, advise the attorneys that this order is appealable within ten days under 28 U.S.C. § 1292(b).

The Clerk will schedule a pretrial conference within thirty days for setting up a discovery schedule and trial assignment.

So ordered.