**SMOKEY'S OF TULSA, INC., in behalf of itself and others similarly situated, Plaintiff,**

v.

**AMERICAN HONDA MOTOR CO., INC., and Honda Motor Co., Ltd., Defendants.**

**No. 77–309–C.**

United States District Court, E. D. Oklahoma.

July 7, 1978.

Lawrence A. G. Johnson, Tulsa, Okl., for plaintiff.

Floyd Walker, Tulsa, Okl., Roland D. Smoot, Los Angeles, Cal., for defendants.

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE, INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS AND LACK OF IN PERSONAM JURISDICTION

MORRIS, Chief Judge.

Plaintiff sues for injuries allegedly sustained in its property and business by reason of defendants' alleged violations of 15 U.S.C. § 72 and sections 1 and 2 of the Sherman Act. Defendant Honda Motor Company, Ltd. has filed a motion to quash service of process and to dismiss for lack of in personam jurisdiction, improper venue, insufficiency of process, and insufficiency of service of process. Defendant's motion is accompanied by a detailed affidavit and a brief. Plaintiff has filed a response but has not filed an opposing affidavit. The defendant has filed a reply brief.

■ Defendant's attack on venue focuses on the antitrust venue statute, 15 U.S.C. § 22, because the "transacting business" test set forth therein is more lenient than the venue provisions contained in 15 U.S.C. § 72, and defendant argues, if venue is improper under section 22 it is necessarily improper under section 72. The parties have not contended that the general venue statute, 28 U.S.C. § 1391 supplements the special antitrust venue statute, 15 U.S.C. § 22, and that question is accordingly not before the court. *See O. S. C. Corp. v.*

*Toshiba America, Inc.*, 491 F.2d 1064, 1068 (9th Cir. 1974); *Grappone, Inc. v. Subaru of America, Inc.*, 403 F.Supp. 123, 133 (D.N.H. 1975).

There are apparently no cases which have interpreted the venue provisions of section 72 and the only reported case under that section sustained venue and jurisdiction under the antitrust laws and thereupon retained jurisdiction over the related anti-dumping counts under the doctrine of pendent venue. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 262, 328 n. 38 (E.D.Pa.1975). Defendant has chosen to follow the *Zenith* approach in its brief and the parties have limited their contentions with respect to venue to the proper interpretation of section 22. The court will accordingly decide the venue question raised in this case solely on the basis of section 22.

■ Before turning to the venue issue, however, the court will address defendant's related contention that the exercise of in personam jurisdiction over the defendant would "offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). It is clear that once it has been determined that a defendant has transacted business in the particular district involved within the meaning of 15 U.S.C. § 22 and is therefore subject to venue under the antitrust laws, his activities qualifying as transacting business under section 22 likewise fully satisfy the constitutional due process test of "minimum contacts," as announced by the United States Supreme Court in *International Shoe*, and as applied in *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and in *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). *See, e. g., Steinway v. Majestic Amusement Co.*, 179 F.2d 681, 684 (10th Cir. 1949); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 262, 328–29 (E.D.Pa.1975). Thus, the jurisdictional issue hinges upon the determination regarding venue, to-wit: if venue is proper so is in personam jurisdiction; if

venue is improper and the action is dismissed as to this defendant on account thereof, the jurisdiction question becomes moot and need not be resolved. Indeed, defendant does not argue the jurisdictional question in its brief other than to quote the "fair play and substantial justice" phrase from *International Shoe*.

■ While defendant's motion to dismiss is based not only on lack of personal jurisdiction and improper venue, Rule 12(b)(2) & (3) Fed.R.Civ.P., but as well on insufficiency of process and insufficiency of service of process, Rule 12(b)(4) & (5) Fed.R.Civ.P., defendant does nowhere contend that the manner of service of process had upon it in this case is improper. Service was effected upon defendant's president in Tokyo, Japan by certified air mail with return receipt pursuant to Rule 4(i)(1)(D) Fed.R.Civ.P. 15 U.S.C. § 22 authorizes service upon a corporation "in the district of which it is an inhabitant, or wherever it may be found." Thus, when venue is properly laid in a judicial district under section 22 extraterritorial service of process running from the district where the action was filed to wherever the corporation may be found, including foreign countries, is proper. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 262, 329 (E.D.Pa.1975) and cases cited therein. Thus, in the absence of any allegations of defective service, resolution of the sufficiency of process and service of process question is dependent upon the court's determination with respect to venue. If venue is proper under section 22 so is process; if venue is improper and the action is dismissed as to this defendant on account thereof the process issue becomes moot.

The antitrust venue statute provides:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or *transacts business*; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found. (Emphasis added).

15 U.S.C. § 22. Defendant in support of its motion urges *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), which holds that a parent corporation cannot be said to be transacting business in a district merely because its wholly owned subsidiary transacts business there and because the two corporations have common officers, unless the court finds that the parent corporation in fact controls and manages the day-to-day business activities of the subsidiary. Defendant also urges *O. S. C. Corp. v. Toshiba America, Inc.*, 491 F.2d 1064 (9th Cir. 1974), *Williams v. Canon, Inc.*, 432 F.Supp. 376 (C.D.Cal.1977), and *Weinstein v. Norman M. Morris Corp.*, 432 F.Supp. 337 (E.D.Mich. 1977).

Plaintiff on the other hand relies on *U. S. v. Scophony Corporation of America*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948), in which the court upheld venue under the antitrust laws (15 U.S.C. § 22) where supervision and control by officers, directors and agents of an English corporation over an affiliated American corporation pursuant to licensing agreements and other elaborate arrangements went far beyond the normal exercise of shareholders' rights. Subsequent cases have relied on *Scophony* to find venue under section 22 when, having examined the factual record before them, they have concluded that the parent corporation is by its conduct in relation to its subsidiary "transacting business" in the district. *Tiger Trash v. Browning-Ferris Industries, Inc.*, 560 F.2d 818 (7th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *Grappone, Inc. v. Subaru of America, Inc.*, 403 F.Supp. 123 (D.N.H. 1975); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 262 (E.D.Pa.1975); *Hitt v. Nissan Motor Co.*, 399 F.Supp. 838 (S.D.Fla.1975); *Call Carl, Inc. v. BP Oil Corp.*, 391 F.Supp. 367 (D.Md. 1975), *cert. denied*, No. 77–356, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Flank Oil Co. v. Continental Oil Co.*, 277 F.Supp. 357 (D.Colo.1967); *Waldron v. British Petroleum Co.*, 149 F.Supp. 830 (S.D.N.Y. 1957).

The key question in each case is: What acts were done by or for the parent corporation in the district? As the Supreme Court put it in *Scophony*:

> The issue is simply how far Congress meant to go, and specifically whether it intended to create venue and liability to service of process through the occurrence within a district *of the kinds of acts done here on Scophony's behalf.* (Emphasis added.)

333 U.S. at 804, 68 S.Ct. at 860. Having set forth the question to be decided, the court then made a detailed examination of the *facts* and determined that:

1. Scophony is a British corporation with its principal place of business in London, England. It manufactures and sells television apparatus. Because of the outbreak of the war in 1939 it had to cease its commercial ventures in England. It "sent personnel to the United States, opened an office in New York City, and began demonstrations of its product and other activities preliminary to establishing a manufacturing and selling business in this country." 333 U.S. at 797, 68 S.Ct. at 857.

2. Late in 1941 Scophony was in financial distress because of restrictions imposed by the British government on the export of currency. It needed new capital from American sources. Arthur Levey, a director of Scophony, and one of its founders, undertook negotiations in New York with two companies in the motion picture and television industry. These negotiations culminated in the execution of three interlacing contracts. One was a so-called master agreement and two were supplemental agreements. The alleged Sherman Act violations centered around these agreements. 333 U.S. at 797 and 798, 68 S.Ct. 855.

3. The master agreement was executed by Scophony, a man named William George Elcock, as mortgagee of all of Scophony's assets, and two American companies. The contracts provided for the formation of a new Delaware

corporation, American Scophony. The shares were owned by Scophony and by the two American companies. Pursuant to the master and supplemental agreement Scophony transferred to American Scophony not only all of its equipment in the United States, but also all patents and other interests in the Scophony inventions within the western hemisphere. 333 U.S. at 798–799, 68 S.Ct. 855.

4. The complex agreements specified the manner in which the Class A shares and Class B shares of American Scophony would be owned, how directors would be elected to the board of American Scophony and how business would be transacted. Levey was named in the agreements as the President and a director of American Scophony. An impasse developed between the "A" and "B" shareholders and the board members elected by them and it was impossible for American Scophony to transact business. Business affairs were further complicated by the institution on December 18, 1945 of the antitrust proceeding in question. 333 U.S. at 800, 68 S.Ct. 855.

5. Levey kept Scophony advised of the developments between the "A" and "B" shareholders and made progress reports to Scophony in London. In addition "other individuals were authorized by Scophony *to act in its behalf in the United States*" and Elcock was sent to New York. Service of process on Scophony was first made on Levey in New York City on December 20, 1945. On April 6, a summons and a copy of the complaint directed to Scophony were served on Elcock in New York City. "He was a *dominant figure* in Scophony" and had been given a power of attorney from Scophony authorizing him to act "and *bind the company in all or any matters affecting the Company's interests in the United States . . .*" It then authorized Elcock to institute and prosecute all proceedings neces-

sary to conserve Scophony's interests; to defend or compromise any suits brought against Scophony; to settle accounts; to engage or dismiss subagents; to *borrow money*; to *dispose of any and all of Scophony's property* and interests in the United States; and "*generally to represent the Company in the United States of America in all matters in any way affecting or pertaining to the Company . . .*" (emphasis added).

333 U.S. at 801, 68 S.Ct. at 858.

Having those facts before it, the court then addressed the question of whether within the meaning of section 22 Scophony was "transacting business" in the Southern District of New York and stated:

To say that *on the facts presented* Scophony transacted no business "of any substantial character" there during the period covered by institution of the suit and the times of serving process would be to disregard the practical, nontechnical, business standard supplied by "or transacts business" in the venue provision. It would be also to ignore the *fact* that Scophony then and there *was carrying on* largely, if not exclusively, *the only business in which it could engage at the time.*

*Scophony's operations in New York were a continuous course of business before and throughout the period in question here.* They consisted in strenuous efforts *not* simply to save an American "investment," as is urged, *but to salvage and resuscitate Scophony's whole enterprise from the disasters brought upon it by the war.* (emphasis added).

333 U.S. at 810, 68 S.Ct. at 863.

Scophony, in support of its motion attacking venue, urged *Cannon Manufacturing Co. v. Cudahy,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634, *Consolidated Textile Corp. v. Gregory,* 289 U.S. 85, 53 S.Ct. 529, 77 L.Ed. 1047, and *People's Tobacco Co. v. American Tobacco Co.,* 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587. The Supreme Court found those cases unpersuasive in the factual setting before it, saying:

Certainly appellee's conclusionary premise cannot be accepted, that its sole authorized or actual business was manufacturing and selling equipment; or therefore the further one that no other activity on its behalf could constitute doing or engaging in business. Indeed it was authorized to take out, hold and exploit television patents, and doing this was certainly as much part of its business as manufacturing and selling the equipment they covered. There is nothing to show that Scophony was restricted by its charter or otherwise to exploiting its patents exclusively by direct manufacture and sale. When therefore, after that method had failed, the company chose another, it was not ceasing to do business.

\* \* \* \* \* \*

The whole framework of this phase of the New York activities was dictated by *the master and supplemental agreements.*

\* \* \* \* \* \*

The contracts created *controls in Scophony,* and in the American interests as well, which taken in conjunction with the stock controls *called for continuing exercise of supervision over and intervention in American Scophony's affairs.*

\* \* \* \* \* \*

Levey kept Scophony informed fully of all that went on here, and in turn received and carried out its instructions respecting American Scophony's affairs *and its own.*

In all this he was not acting merely as an officer of American Scophony. Rather he was also Scophony's director and representative, *authorized to act on its behalf and interest.*

\* \* \* \* \* \*

Moreover, other individuals carried on for Scophony in continuing efforts to resolve the impasse. Apart from what was done by others, Elcock came to New York with *unrestricted and irrevocable power to act on Scophony's behalf.* Indeed it might almost be said, in view of his triple position as mortgagee, corporate officer and attorney-in-fact, that for all relevant purposes at this phase of Scophony's activity, *he was the company.* The stalemate put Scophony's affairs in this country at a standstill along with those of American Scophony. And Scophony's efforts to extricate itself were both strenuous and continuous. (Emphasis added).

333 U.S. at 813–816, 68 S.Ct. at 864–866. Not surprisingly, the court thus concluded:

We think that Scophony not only was "transacting business" of a substantial character in the New York district at the times of service, so as to establish venue there, but also on *the sum of the facts* regarding its activities was "found" there *within the meaning of the service-of-process clause of § 12.*

333 U.S. at 818, 68 S.Ct. at 866. (Emphasis added).

■ The crystal clear teaching of *Scophony* is that "transacting business" depends on the *facts* as found by the court. *See also Tiger Trash v. Browning-Ferris Industries, Inc., supra; O. S. C. Corp. v. Toshiba, America, Inc., supra.* In such a case, the court simply must determine whether "the kinds of acts done here" by the parent corporation constitute transacting business.

■ Attached to the defendant's motion to dismiss for lack of venue is an affidavit by the president of American Honda Motor Co., Inc. It provides in part as follows:

KOICHIRO YOSHIZAWA, being duly sworn, deposes and says that:

1. He is the President of American Honda Motor Co., Inc. (hereinafter referred to as American Honda) and a director of Honda Motor Co., Ltd. (hereinafter referred to as Honda, Ltd.).

2. Honda Ltd. is a Japanese corporation engaged in the business of manufacturing and selling, among other things, Honda motorcycles and parts therefor in Japan.

3. Honda Ltd. sells motorcycles (and other motorcycle products) to American Honda. These sales are arms length transactions, and, in particular, the prices

at which products are purchased are subject to vigorous negotiation. American Honda imports the motorcycle products from Japan into the United States. American Honda has established motorcycle warehouses and parts depots at several locations throughout the United States and the motorcycle products it purchases from Honda Ltd. are shipped directly to these facilities. None of these warehouses and depots is located in the State of Oklahoma.

4. American Honda is a California corporation having its principal place of business in Gardena, California. It is a wholly-owned subsidiary of Honda Ltd. and is the exclusive distributor of Honda motorcycles (and parts therefor) in the United States. American Honda controls the distribution and sale of Honda motorcycle products throughout the United States. In that capacity, American Honda has established and authorized a network of Honda dealers throughout the United States (of which plaintiff Smokey's of Tulsa, Inc. is one) to sell and service Honda products. American Honda also advertises Honda motorcycle products, and performs all other matters relating to the distribution and sale of Honda motorcycles in the United States.

5. American Honda and Honda Ltd. are separate entities. American Honda has its own Board of Directors, its own officers and its own employees which determine American Honda's policies and carry on American Honda's business. The records of American Honda are separate from those of Honda Ltd. All officers and directors of American Honda are paid for their services to American Honda by American Honda.

6. The general business policies of American Honda are subject, by virtue of stock ownership, to ultimate review by Honda Ltd., and Honda Ltd. is kept informed of important actions taken by the management of American Honda. However, American Honda enjoys independent responsibility for the management of its business, including responsibility and control over the day-to-day opera-

tions of its business. American Honda has 9 directors, 5 corporate officers and 9 operational vice presidents with limited, specialized authority. Honda Ltd. has 24 officers and directors, which includes 3 auditors. There is only one other person, besides himself, who is both an officer or director of American Honda and an officer or director of Honda Ltd.

7. To the best of his knowledge and belief, Honda Ltd. is not licensed to do business in the State of Oklahoma; Honda Ltd. has no bank account in the State of Oklahoma; Honda Ltd. has no property, either owned or leased, in the State of Oklahoma; Honda Ltd. has no phone listing in the State of Oklahoma; Honda Ltd. has no agent or representative in the State of Oklahoma; no officer, director or employee of Honda Ltd. has been present in the State of Oklahoma for any business purpose on behalf of Honda Ltd.; Honda Ltd. has no agent, dealer or jobber in the State of Oklahoma; Honda Ltd. has never solicited business in the State of Oklahoma; Honda Ltd. has no branch office, warehouse or other place of business in Oklahoma; and Honda Ltd. has never shipped goods directly into the State of Oklahoma for any purpose whatsoever.

The affidavit is uncontroverted. While plaintiff argues the facts with eloquence saying

We pray the court not to accept the regressive argument of Honda Ltd. but to forge forth by piercing the corporate matrix of American Honda to find venue of Honda Ltd.

it appends to its response not so much as one word under oath to refute defendant's affidavit. There is no counter affidavit of any kind. Defendant's affidavit clearly establishes the following:

1. Honda Ltd. is a Japanese corporation engaged in the manufacture and sale in Japan of motorcycles. Arms length sales are made to American Honda. American Honda then imports the motorcycles into the United States and places them in warehouses. No warehouse or depot is located in Oklahoma.

2. American Honda is a California corporation having its principal place of business in California. It is a wholly-owned subsidiary of Honda Ltd. American Honda controls the distribution and sale of Honda motorcycles in the United States. It advertises Honda motorcycle products and performs all matters pertaining to distribution.

3. American Honda and Honda Ltd. are separate corporate entities. They have separate boards of directors. Their records are kept separately. American Honda has 9 directors, 5 corporate officers and 9 operational vice presidents with limited specialized authority. Honda Ltd. has 24 officers and directors. Two persons who are either an officer or a director of Honda Ltd. are an officer or director of American Honda.

4. Honda Ltd. is not licensed to do business in Oklahoma; it has no bank account and owns no property in Oklahoma.

5. Honda Ltd. has no agent or representative in Oklahoma.

6. No officer, director or employee of Honda Ltd. has ever been in the state of Oklahoma for any business purpose on behalf of Honda Ltd. and Honda Ltd. has never solicited business in the state of Oklahoma, has no branch office, warehouse or other place of business here and has never shipped goods directly into the state for any purpose whatsoever.

7. Honda Ltd. has no agent, dealer or jobber in the state of Oklahoma.

On a venue question uncontroverted facts contained in an affidavit "must be accepted as true." *Grantham v. Challenge-Cook Bros., Inc.,* 420 F.2d 1182, 1186 (7th Cir. 1969). Moreover, plaintiff "has the burden of establishing proper venue." *Grantham, supra,* at 1184; *Aro Manufacturing Co. v. Automobile Body Research Corp.,* 352 F.2d 400, 403 (1st Cir. 1965), *cert. denied,* 383 U.S. 947, 86 S.Ct. 1199, 16 L.Ed.2d 210 (1966); *Grappone, Inc. v. Subaru of America, Inc.,* 403 F.Supp. 123, 128 (D.N.H.1975); *Call Carl, Inc. v. BP Oil Corp.,* 391 F.Supp. 367, 370 (D.Md.1975), *cert. denied,* No. 77–356, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977). When a motion to dismiss is filed, attacking venue or jurisdiction,

> supported by affidavits, the non-moving party may not rest upon allegations or denials in his pleadings but his response by affidavit or otherwise must set forth specific facts showing that the court has jurisdiction. In this respect the rule is similar to a motion for summary judgment under Rule 56(e), Fed.R.Civ.P.

*Weller v. Cromwell Oil Co.,* 504 F.2d 927, 929–930 (6th Cir. 1974). And these principles have been held to apply specifically to venue questions under section 22 of the antitrust laws, that is "facts disclosed by an uncontroverted affidavit are accepted as true." *Ohio-Midland Light and Power Co. v. Ohio Brass Co.,* 221 F.Supp. 405, 407 (S.D.Ohio 1962); *See, also, Goldberg v. Wharf Constructers,* 209 F.Supp. 499, 505 (N.D.Ala.1962); *Griffin v. Illinois Central R. Co.,* 88 F.Supp. 552, 555 (N.D.Ill.1949).

There is nothing before the court which suggests that the defendant Honda Ltd. is transacting business in the Eastern District of Oklahoma; the admitted facts show that it is not. The motion to dismiss is granted.