770 F.2d 165
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 AMERICAN EXPLORATION COMPANY; THE CLINTON OIL COMPANY, EDCO
DRILLING & PRODUCING, INC.; HOPCO RESOURCES, INC.; LAND PRO
VEST, INC.; UNIVERSAL MINERALS, INC.; VICKING RESOURCES
CORPORATION; CONSOLIDATED RESOURCES OF AMERICA; CRA 1977
GERNSEY COUNTY DRILLING PROGRAM; CRA/GRADVANTAGE 1977
PROGRAM A; CRA 1979 PROGRAM B; CRA 1978 PROGRAM A, DBA
CRA/GRANDVANTAGE 1979 PROGRAM 1; CRA 1978 CUERNSEY COUNTY
DRILLING PROGRAM; CRA/SPECTRUM 7 1979 DRILLING PROGRAM AKA
CRA/RD 1979; CRA 1979 GUERNSEY COUNTY DRILLING PROGRAM I DBA
1979 GUERNSEY CO.; DRILLING PROGRAM I; CRA/GRANDVANTAGE 1977
PROGRAM B; CRA/SPECTRUM 7 1980 PROGRAM 1; CRA-1981 DRILLING
PROGRAM; CRA/SPECTRUM 7 1980 DRILLING PROGRAM I DBA CRT
SPECTRUM 7 1980 DRILLING PROGRAM; CRA-1982 DRILLING PROGRAM,
PLAINTIFFS-APPELLANTS,
v.
COLUMBIA GAS TRANSMISSION CORP., DEFENDANT-APPELLEE.
 
 NO. 85-3227
 United States Court of Appeals, Sixth Circuit.
 7/30/85
 S.D.Ohio
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
 Before: KEITH, MERRITT and CONTIE, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 In this diversity action under Ohio law, the plaintiffs, a group of Ohio corporations and partnerships who are owners, operators and producers of natural gas wells located in the Clinton standstone formation in eastern Ohio, seek a preliminary injunction prohibiting defendant Columbia Gas Transmission Corporation (Columbia) from implementing a plan to purchase only 25% of the gas produced by these wells during 1985 under a long-term 'take or pay' contract between the plaintiffs and Columbia. The District Court declined to issue a preliminary injunction because it found that the plaintiffs are unlikely to succeed on the merits because the contract allows Columbia to curtail its purchases in the proposed manner. For the reasons stated below, we affirm.
 
 I.
 
 2
 Beginning in 1981, the plaintiffs entered into gas purchase contracts with Columbia for the wells at issue here which provide that the plaintiffs must sell to Columbia and Columbia must buy from plaintiffs all the gas produced by these wells for the productive lifetime of the well. See sections 1.1 and 2.1 of the contract, Plaintiffs' Exhibit FF, Appendix, 22-52. In addition, section 10.1 of the contract provides that Columbia will pay the maximum lawful price under federal gas regulations, and under section 6.2, a 'take or pay' clause common in oil and gas contracts, 'seller will sell and deliver to buyer, and buyer will purchase and take from seller, or pay for if available and not taken during each contract year . . . an average quantity of gas equal to seventy-five per cent of seller's delivery capacity.'
 
 
 3
 The basic structure of the contract is thus that of a fixed-price output contract with Columbia obligated to take or pay for later a fixed percentage of the plaintiffs' gas in any given year. The contract provides clear benefits to the producers, and was offered by Columbia at a time of gas shortages to attract producers and secure greater supplies. However, Columbia's actual obligation to purchase and take gas during any given year is severely limited by clear language in several other provisions of the contract. First, section 6.1 provides that although Columbia, 'insofar as it can consistently do so having regard for its other related interests, (promises) to take all the gas the seller has available during the term of this contract at the full flow of said gas from seller's pipeline into buyer's pipeline . . .
 
 
 4
 [I]t is further expressly understood and agreed that Buyer may restrict the flow or discontinue the taking of the gas temporarily, when and for such length of time as in its judgment it is deemed expedient so to do, Buyer's judgment being based upon consideration of market demand, its then existing pipeline facilities, the line pressure it deems necessary to maintain, and the competitive and other conditions in the various fields in which it is purchasing or producing gas.
 
 
 5
 In addition, section 6.4 of the contract provides that '[i]t is recognized that buyer may not be able to take and need not take gas from seller hereunder . . . during any definite period,' and section 6.5 provides that so long as the volume of gas specified in the take or pay clause is taken or paid for, 'all gas delivered hereunder may be taken in whatever manner and at such times as will best suit the convenience of the Buyer.'
 
 
 6
 The record established at the hearing on the preliminary injunction held before the District Court shows that Columbia has exercised its rights under these clauses granting it the power to curtail production frequently in the past several years, as market conditions have changed and supply shortages have lessened and demand has fallen off. Columbia 'shut-in'--that is, closed access to the transmission pipelines and stopped production--plaintiffs' wells for sixty days in 1981, for five months in 1982, and for six months (alternating on and off) in 1983. In 1984, Columbia demanded a reduction in the price of plaintiffs' high-priced Clinton formation gas, which then had a maximum price under federal law of $6.00 per standard unit, to $4.50 per unit. When plaintiffs refused to modify the price term in their contracts with Columbia and agree to this lower figure, Columbia announced that it would shut-in all gas, both high and low priced, produced by the plaintiffs for six months in 1984, this despite plaintiffs' complaints that it was unreasonable for Columbia to shut-in both low and high priced gas because plaintiffs would not agree to lower the price on high priced gas.
 
 
 7
 After plaintiffs brought suit and secured a temporary restraining order, the parties reached a settlement agreement covering 1984. On November 30, 1984, Columbia announced an explicitly price-based purchase schedule for 1985, proposing to purchase 100% of all gas priced at $3.00 per unit, 75% of all gas priced at $3.00 to $3.50 per unit, and 25% of all gas priced over $3.40 per unit. In January, 1985, the plaintiffs brought the present action seeking to enjoin implementation of the 1985 purchase plan.
 
 
 8
 Plaintiffs claim that Columbia's proposed restrictions will severely damage the output capacity of their wells, due to the geologic nature of the sandstone into which they are drilled, and that Columbia's plan is not a permissible curtailment under section 6.1 of the contract because its extent--purchasing only 25% of available supplies during the year--exceeds that which is permissible under section 6.1 and because the curtailment is not based on 'market demand' as that term has come to be understood in the course of performance under the contract. Plaintiffs thus claim that Columbia's plan represents a bad faith attempt to coerce a modification in the price term of the contract.
 
 
 9
 The District Court found that the plaintiffs' wells would be irreparably damaged by Columbia's plan, but denied the motion for a preliminary injunction because it found that the plaintiffs had not demonstrated a likelihood of success on the merits. The court found that section 6.1 expressly allowed Columbia to discontinue taking gas for 'such length of time as it deemed expedient,' because of considerations of market demand, and it rejected plaintiffs' contention that 'market demand' does not include price considerations but only seasonal variation in demand in the following terms:
 
 
 10
 It is rudimentary economics that supply and demand are by their very nature relative to price. Indeed, it is meaningless to speak of demand for a product except at a given price. Further, it appears that plaintiffs' contention fails in light of the facts developed at trial. The evidence indicated that in fact there was no market for $6.00 gas and that market demand for gas fell with rising prices. Tr. 246, 287, 333.
 
 
 11
 A. 81-82.
 
 
 12
 On plaintiffs' claim of bad faith modification, the District Court found that there was 'no doubt that there has been a change in the market for natural gas' and that 'such a market shift provides a l gitimate reason for seeking a modification of the price of goods to be purchased,' and that although Columbia's tactics were severe, it had acted within its contractual rights to curtail purchases, and 'so long as a party seeking modification stays within its legal rights under the contract, it may bring economic pressure to bear to seek a modification.' A. 87. The court thus found that plaintiffs were unlikely to succeed on either claim, because Columbia had the contractual right to curtail production to the proposed extent.
 
 II.
 
 13
 The general standard of appellate review in preliminary injunction cases is 'abuse of discretion' by the trial court, and 'in order to reverse the trial court we must find that it has made a serious and important error respecting the requirements of likelihood of success on the merits or irreparable injury.' National Board of YMCA v. Flint YMCA, No. 84-1262, slip op. at 2 (6th Cir. April 19, 1985). While we are not limited in our review in the District Court's decisions on the interpretation of the law, see, e.g., Delaware & Hudson Railroad Co. v. United Transportation Union, 450 F.2d 603, 620 (D.C. Cir.), cert. denied, 403 U.S. 911 (1971), the District Court's findings of fact will not be set aside unless clearly erroneous. Anderson v. City of Bessemer, ---- U.S. ----, 105 S.Ct. 1504, 1511-12 (1985); see also 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2962, at 633-36 (1973).
 
 
 14
 The plaintiffs contend that the phrase in section 6.1 providing that Columbia may 'restrict the flow or discontinue the taking of the gas temporarily, when and for such length of time as in its judgment it is deemed expedient so to do, (Columbia's) judgment being based on consideration of market demand,' does not permit Columbia to curtail annual purchases to the very low level proposed and does not allow Columbia to take less because demand at the maximum lawful price provided by the contract has fallen off. The District Court's interpretation of the meaning of 'market demand' as including lack of demand at a particular price accords with the most basic principles of economics, under which, unless completely inelastic, demand varies inversely with price and cannot be spoken of except with reference to price. Further, the court correctly observed that although Columbia can only curtail production 'temporarily,' the length of any curtailment is determined ultimately by Columbia's judgment. While the plaintiffs' witness Wilson did testify that course of performance under the contract limited Columbia's power to curtail to short periods, sixty to ninety days in length, it was for the trial court to weigh the credibility of this testimony in light of the history of past curtailments and the clear language of the contract. We do not find that the court committed clear error in ruling that section 6.2 and the other sections giving Columbia wide discretion in determining when and how much to curtail plaintiffs' production permit Columbia to actually purchase only 25% of plaintiffs' gas during 1985.
 
 
 15
 Plaintiffs also contend that Columbia has exercised its contractual rights in bad faith in an attempt to coerce a modification in the price term of the contract. This case is governed by Article 2 of the UCC as enacted in Ohio Revised Code Secs. 1302.01-1302.98 (1984), and the UCC imposes a general obligation of good faith, O.R.C. Sec. 1301.09 (UCC 1-203) which for a merchant means 'honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.' O.R.C. Sec. 1301.02(C) (UCC 1-102(3)). In Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134, 145-46 (6th Cir. 1983), we held that in determining whether a party has modified a contract in bad faith, a court is to inquire into 'whether the party's conduct is consistent with 'reasonable standards of fair dealing in the trade' (the UCC good faith test) . . . and whether the parties were in fact motivated by honest desire to compensate for commercial exigencies,' and 'the party asserting the modification must demonstrate that his decision to seek modification was the result of a factor, such as increased costs, which would cause an ordinary merchant to seek modification of the contract.'
 
 
 16
 The District Court found that changed market conditions motivated Columbia in seeking a price reduction in the high price Clinton formation gas, and although plaintiffs say there was no evidence that such a change was the motivating factor, Columbia's letters to the plaintiffs announcing curtailments from 1981 to 1984 repeatedly state that its market requirements were below projected levels and Columbia's 1983 letter said that it needed a price reduction because of its 'competitive position.' Finally, plaintiffs' witness testified that plaintiffs realized the 'market conditions' facing Columbia and that '[i]t was the competitive fuel nature that created the problem with price.' T. 287, 333. The District Court's finding that market conditions motivated Columbia to seek a price modification is not clearly erroneous.
 
 
 17
 The second prong of the Roth Steel test is the determination of whether 'the means used to obtain a modification are an impermissible attempt to obtain a modification by extortion or overreaching.' 705 F.2d at 147. However, the Roth Steel decision recognized that prima facie evidence of bad faith from coercive conduct may be rebutted, and found the defendant seller failed to rebut the inference only because although it had the right to refuse to sell cold rolled steel, for which it had demanded a higher price due to changed market conditions, it had no right to also refuse to sell the buyer hot rolled steel to coerce the buyer into accepting the higher price on cold rolled steel. Likewise, in Columbia Gas Transmission v. Larry H. Wright, 443 F. Supp. 14, 23 (S.D. Ohio 1977), the court held that although Columbia had the right to withhold payments for gas delivered from wells at which it had evidence of meter tampering, in order to collect overpayments and advance payments made because of the tampering, its withholding of payments for all wells, even those for which no tampering was suspected, and its refusal to pay anything toward current gas deliveries until the overcharge had been set off constituted commercially unreasonable conduct.
 
 
 18
 Here, by contrast, Columbia proposes to exercise its contractual right to curtail production and purchases in a manner which is specifically targeted at high price gas. The District Court found that changed market conditions both motivated this plan and provided a contractual justification for such a curtailment in Columbia's purchases. Columbia's proposed action is therefore distinguishable from the practices found unreasonable in Roth Steel and Columbia Gas Transmission v. Larry H. Wright, and at most constitutes an aggressive reponse to the failure of these commercially sophisticated parties to negotiate a solution to a change in market conditions of the risk of which both parties were well aware.
 
 
 19
 Accordingly, the judgment of the District Court is affirmed.