Daniel GARSHMAN and Donald Frank, as General Partners for Tarbell I, a Limited Partnership, et al., on their own behalf and as representatives of all private persons and business entities throughout the United States who are gas producer/investors who have funded gas well exploration in New York and Pennsylvania for resale to the pipeline services of Columbia Gas Transmission Corporation, Plaintiffs,

v.

UNIVERSAL RESOURCES HOLDING, INC., a Pennsylvania Corporation; U.S. Energy Development Corporation, A New York Corporation; Chautauqua Energy, Inc., a New York Corporation; Columbia Gas Transmission Corporation, a Delaware Corporation; and the Columbia Gas System, Inc., a Delaware Corporation, Defendants.

Civ. A. No. 85–2369(SSB).

United States District Court, D. New Jersey.

Aug. 18, 1986.

Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz, P.C. by Robert N. McAllister, Northfield, N.J., for plaintiffs.

Tomar, Parks, Seliger, Simonoff & Adourian by William Tomar, Haddonfield, N.J., Duane, Morris & Heckscher by Michael M. Baylson, Philadelphia, Pa., for defendant-crossclaim plaintiff Universal Resources Holding, Inc.

McCarter & English by James F. Hammill, Cherry Hill, N.J., Cravath, Swaine & Moore by John E. Beerbower, New York City, for defendants Columbia Gas Transmission Corp. and The Columbia Gas System, Inc.

Jaeckle, Fleischmann & Mugel by William P. Tedards, Washington, D.C., for defendant Chautauqua Energy, Inc.

BROTMAN, District Judge:

This case concerns commercial relationships in the natural gas industry, an industry whose character has changed drastically in the past decade due to volatile market forces and federal regulation. In an earlier decision, this court dismissed antitrust claims against an interstate pipeline company by investors in production companies which drill for natural gas and sell it to the pipeline. *Garshman v. Universal Resources Holding, Inc.,* 625 F.Supp. 737 (D.N.J.1986) ("Garshman I"). In October 1985, before the court dismissed the complaint as to defendant Columbia Gas Transmission Corporation ("Transmission"), defendant Universal Resources Holding, Inc. ("Universal") filed a crossclaim against Transmission and its parent, The Columbia Gas System, Inc. ("System"), a public utility holding company. The crossclaim alleges that Transmission and System violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and states additional state law claims sounding in duress, breach of contract, tortious interference with contractual relations, and indemnification. The court's jurisdiction over the crossclaim is ancillary to its federal question jurisdiction over the main action.

Several issues are now before the court. First, System moves to dismiss Universal's crossclaim for improper venue, Fed.R. Civ.P. 12(b)(3), for lack of personal jurisdiction, Fed.R.Civ.P. 12(b)(2), and for failure to state a claim on which relief can be granted, Fed.R.Civ.P. 12(b)(6). In addition, System moves to dismiss the amended complaint in the main action on identical grounds. Second, Transmission moves to dismiss the crossclaim for failure to state a claim. Finally, Universal seeks injunctive relief against Transmission and System with respect to additional contracts for gas wells in the region.

## I. The Industry

Understanding the crossclaims' allegations requires understanding the economic history of the natural gas industry over the last decade. During the mid–1970's, there was a severe undersupply of natural gas and pipeline companies like Transmission could not satisfy their customers' demands. In response, Congress enacted the Emergency Natural Gas Act of 1977, Pub.L. 95–2, 91 Stat. 4–10, February 2, 1977, and the subsequent Natural Gas Policy Act of

1978 ("NGPA"), 15 U.S.C. § 3301 *et seq.* NGPA was enacted as part of a comprehensive legislative scheme designed to curtail national energy consumption. *See* House Conference Report No. 95–1752, U.S.Cong. & Admin.News, 95th Cong., 2d Sess., pp. 8800, 8983 *et seq.* (1978). In particular, NGPA sought to ameliorate the shortage of natural gas through partial decontrol of prices. *See Garshman I, supra,* 625 F.Supp. at 739.

Higher prices prompted new exploration and development of natural gas wells, so the available supply increased steadily into the 1980's. In the meantime, several factors combined to deflate demand beneath projected levels. Among those factors were heightened energy conservation efforts, a steep decline in the price of oil, increased competition from alternate fuels, and the 1981–82 recession. Within five years after Congress intervened, there was a nationwide oversupply of natural gas.

In the 1970's, Transmission could not purchase enough gas to supply its customers. In the wake of NGPA, Transmission met 100 percent of that demand in 1979. *Id.* at 740. Transmission then proceeded to secure supply contracts to cover estimated future demand. Transmission entered into a five-year contract with Universal in 1981 under which Transmission leased to Universal a tract of land in western New York. Universal was obligated to deliver all of the natural gas produced on the land to Transmission, which agreed to take or pay for at least 75 percent of the wells' estimated yearly output. Such "take or pay" contracts are common in the industry. Transmission agreed to pay the "maximum lawful price applicable" under federal law. *Id.* Transmission's obligations under this contract and numerous others like it approached $2 billion when the market turned down. In its earlier opinion, the court described Transmission's dilemma and solution:

> Faced with this dramatic shift in the market, and saddled with overwhelming contractual obligations through 1986,

[Transmission] sought to renegotiate the prices it paid to producers like Universal in order to bring those prices in line with market levels. [Transmission] allegedly coerced producers into renegotiating price terms by threatening that it would not assign leases for future exploration to producers who did not renegotiate existing contracts. [Transmission] also allegedly threatened to curtail the amount of gas it took from those producers by cutting production allocation and manipulating pressure in the pipeline. In other words, [Transmission] allegedly threatened to refuse to deal in the future with producers who failed to comply with its present demands.

Universal eventually capitulated and a new price clause was incorporated into its contract with [Transmission] by an agreement dated August 29, 1984. [Transmission] has purchased gas under that contract pursuant to its terms since that time.

*Garshman I, supra,* 625 F.Supp. at 740. *See also American Exploration Company v. Columbia Gas Transmission Co.,* 779 F.2d 310 (6th Cir.1985).

## II. Personal Jurisdiction and Venue as to Defendant System

### A. Universal's Crossclaim

■ The court now turns to System's motions to dismiss the crossclaim. Universal bears the burden of pleading and proving facts which support the court's exercise of personal jurisdiction over System and establish that venue is proper in this district. *Gehling v. St. George's School of Medicine,* 773 F.2d 539, 542 (3d Cir.1985). The threshold inquiry is venue, and the applicable standard in a private antitrust case is Section 12 of the Clayton Act, 15 U.S.C. § 22:

> Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district

of which it is an inhabitant, or wherever it may be found.

The analyses of venue and personal jurisdiction are "virtually congruent," since both are controlled by general due process principles. *Sportmart, Inc. v. Frisch*, 537 F.Supp. 1254, 1257 (N.D.Ill. 1982). *See also United States v. Scophony Corporation*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); *Smokey's of Tulsa, Inc. v. American Honda Motor Co.*, 453 F.Supp. 1265, 1267 (E.D.Okla.1978). If venue is established, the court may obtain personal jurisdiction over the defendant through extra-territorial service of process. If venue is improperly laid in this district, the personal jurisdiction issue becomes moot. *Sportmart, supra*, 537 F.Supp. at 1257.

System is neither an "inhabitant" of nor "found" in New Jersey. To be "found" in a district, "a corporation must have duly authorized 'officers and agents carrying on the business of the corporation' within the district and 'the nature and character of its business must be such as to warrant the inference that it is engaged in continuous local activity' there." *Athletes Foot of Del., Inc. v. Ralph Libonati Co.*, 445 F.Supp. 35, 42 (D.Del.1977), *citing Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 371, 47 S.Ct. 400, 402, 71 L.Ed. 684 (1927). System is a Delaware corporation with its headquarters and sole place of business in Delaware. Affidavit of Hart T. Mankin, ¶ 2. System is not and has never been licensed, registered or qualified to conduct or transact business in New Jersey. *Id.*, ¶ 4. System owns no real property in New Jersey, has no officer, agent or employee acting on its behalf here, and has no office, postal address, telephone or other physical manifestation in the state. *Id.*, ¶ 5. Therefore, only if System "transacts business" in New Jersey is venue appropriate in this jurisdiction. *Call Carl, Inc. v. BP Oil Corporation*, 391 F.Supp. 367 (D.Md.1975).

Transmission, System's wholly-owned subsidiary, does "transact business" in New Jersey by supplying gas to Elizabethtown Gas Company in Elizabeth, New Jersey. Exhibit A to Universal's brief in Opposition to System's Motion. Universal contends that because the subsidiary has contacts with New Jersey that are sufficient for venue as to it, and because System owns 100 percent of Transmission's stock, venue should therefore lie as to the parent.

A parent corporation "transacts business" in a forum only if it actually controls the activities of the subsidiary which transacts business in the forum and allegedly violated the antitrust laws. *Caribe Trailer Systems v. Puerto Rico Maritime Shipping Authority*, 475 F.Supp. 711, 717–18 (D.D.C.1979), *aff'd* No. 79–1658 (D.C.Cir.1980) (per curiam), *cert. denied* 450 U.S. 914, 101 S.Ct. 1355, 67 L.Ed.2d 339 (1981). While the court must consider the "totality of the relationship" between the parent and the subsidiary, *Call Carl, supra*, 391 F.Supp. at 371, the "essential element" is whether the parent exercised control over the specific conduct which allegedly violated the antitrust laws. *Caribe Trailer, supra*, 475 F.Supp. at 717–18. Stated differently, the "key factor" in determining venue "is the ability of the parent to influence major decisions of the subsidiary which lead or could lead to violations of the antitrust laws." *Call Carl, supra*, 391 F.Supp. at 371, *citing Flank Oil Co. v. Continental Oil Co.*, 277 F.Supp. 357, 365 (D.Colo.1967).

Universal relies on several factors which purportedly evince System's influence over Transmission. First, Universal argues that System is Transmission's sole stockholder. One hundred percent ownership of a subsidiary's stock does not alone establish venue over the parent. *King v. Johnson Wax Associates*, 565 F.Supp. 711, 718 (D.Md.1983); *Scophony, supra*, 333 U.S. at 814, 68 S.Ct. at 864.

Second, Universal contends that System "lends money, holds debt, finances through bond debentures the resources needed.... and directs the allocation of

these resources." Universal's Brief at 11.* In support of these contentions, Universal cites excerpts from System's 1984 annual report and first 1985 quarterly report to shareholders. *Id.* at 12, 11. Most telling, according to Universal, is an "admission" in a letter to shareholders from John H. Croom, System's chairman and chief executive officer, that System's directors "have closely monitored the Transmission subsidiary's development of the settlement with the customers and the development of its producer proposal.... [A]t my recommendation, a special committee of directors was appointed by the Board in December to dig into every aspect of the work under way." *Id.* at 11.

■ This argument relies on superficial semantic choices. By dissecting System's public, published statements, Universal presumes to divine System's operational structure and relationship with its subsidiaries. Language in an annual or quarterly report, initially selected by a public relations director or an in-house corporate communicator and later approved by an officer or director, proves nothing about the corporation's underlying structural dynamic. Universal attaches undue significance to the use of phrases like "our operations," "our customers," and "our prices" in System's 1984 annual report. Taken in context, these phrases refer to System and all of its subsidiaries. In other passages, which Universal omits from its selected excerpts, the annual report describes Transmission's independent business operations.

In *King, supra,* the plaintiffs tried to argue that a telex from the parent to the subsidiary that referred to "how we manage the business" indicated that the parent controlled the subsidiary. In response, the court noted that plaintiffs had overlooked or ignored contrary language in the same telex, such as a reference to "the strategic direction for your company." Explaining that the telex should be "viewed

... as a whole" rather than "dissect[ed] ... word for word," the court concluded that the telex was "not enough to evince control" of the subsidiary by the parent. 565 F.Supp. at 718.

■ Viewed as a whole, the reports proffered by Universal suggest at most that System has some general input into Transmission's decision-making process. But as long as the subsidiary ultimately makes its own business decisions, the parent's general input is irrelevant. "A subsidiary need not spurn or disregard the corporate policy of its parent ... to maintain inviolate the separate existence of the two corporations ... but its policies may not be guided solely in consequence of the corporate policy and management decisions of its parent." *Call Carl,* 391 F.Supp. at 374.

A parent may monitor or review its subsidiary's policies and business decisions "without destroying its corporate separateness for jurisdictional purposes." *Sportmart, supra,* 537 F.Supp. at 1258 n. 7. For example, in *King,* the parent asked its wholly owned subsidiary "for information regarding its ... long-range financial and marketing plans." 565 F.Supp. at 718. The court held that the request was not evidence of the parent's control, because "[a]ll major stockholders share an interest in being informed of their companies' long-term goals." *Id.* Similarly, in *Smokey's of Tulsa, supra,* the court held that the parent's review of the "general business policies" and "important actions" of its wholly owned subsidiary "enjoy[ed] independent responsibility for the management of its business." 453 F.Supp. at 1271.

While System's annual and quarterly reports neither definitively prove nor disprove that System "controls" Transmission in a general sense, they suggest at most only parental oversight of the subsidiary's affairs. Universal points to no facts which

---

* Loans from a parent to a subsidiary merely "indicate a relationship between the companies, [are] totally consistent with parent-subsidiary status, [and] do not indicate any degree of control whatsoever." *King, supra,* 565 F.Supp. at

718–19. Even if System does provide Transmission with "financial assistance," that has nothing to do with the conduct at issue in this lawsuit. Whether System controlled that conduct is the issue.

even intimate that System exercised control over Transmission's renegotiation of its gas purchase contracts with producers.

Transmission is not a shell created to shield System from liability. System itself is a public utility holding company, a creature of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 *et seq.* Ordinary corporations may create or acquire subsidiaries to manage a discrete phase of their operations—sales, for example, or services. *E.g. Smokey's of Tulsa, supra,* 453 F.Supp. 1265 (subsidiary was exclusive U.S. distributor of Japanese parent's motorcycle products). A public utility holding company, on the other hand, conducts no independent business. It acts merely as a conduit for federal regulation of the utility industry. Congress enacted the public utility legislation in 1935 to protect the public, investors, and consumers from manipulation of advertisements and sales of utility securities. As a public utility holding company, System engages in no commercial activity other than holding the voting stock and debt of its wholly owned subsidiary.

Universal's final argument is that System controls Transmission because System's operating company, Columbia Gas System Service Corporation ("Service") furnishes professional services at cost to the parent company and to operating company affiliates. Universal notes that System and Service have overlapping directorates, but never explains what System's close relationship to Service has to do with System's purported control over Transmission. The court sees no significant connection.

Since Universal has failed to satisfy its burden of showing that System "transacts business" in New Jersey, the court concludes that venue as to System is not appropriate in this district. Universal submits that should the court reach this conclusion, the court should grant Universal leave to conduct jurisdictional discovery in order to obtain further information with regard to the interconnection between System and Transmission. The court will not order such discovery.

Admittedly, Universal has not had an opportunity to conduct discovery on the issues of venue and jurisdiction. Plaintiffs, however, did submit documents to the court in opposition to a motion by System to dismiss the complaint for lack of personal jurisdiction. (That motion was withdrawn without prejudice by agreement of the parties when plaintiffs indicated their intention to file an amended complaint.) Universal had access to and relied on the documents submitted by plaintiffs. The Third Circuit does require that a trial court permit jurisdictional discovery unless the plaintiff's claim is "clearly frivolous." *Nehemiah v. The Athletics Congress,* 765 F.2d 42, 28 (3d Cir.1985), *citing Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances,* 723 F.2d 357, 362 (3d Cir.1983). In light of System's status as a regulated holding company and the utter absence of any hint that System controls Transmission's operations, this court must categorize Universal's contention that System "transacts business" in this district as clearly frivolous. Venue as against System will not lie in this district. Without proper venue, the court need not reach the issue of personal jurisdiction, even though the Section 12 test for venue in private antitrust actions is nearly identical to standard due process analysis for personal jurisdiction.

Accordingly, the court will grant defendant System's motion to dismiss the crossclaim for improper venue. Its motions to dismiss for lack of personal jurisdiction and on the merits are rendered moot.

## B. System's Motion to Dismiss Plaintiffs' Amended Complaint

Also before the court at this time is System's motion to dismiss plaintiffs' amended complaint in the main action. For the reasons just stated, the court will grant System's motion on the grounds that venue against it is improper in this district.

### III. Transmission's Rule 12(b)(6) Motion

#### A. The Standard of Review

On a motion to dismiss a complaint under Fed.R.Civ.P. 12(b)(6), the court must consider the complaint's factual allegations as true and give the plaintiff the benefit of all reasonable inferences. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 444 (3d Cir. 1977). As a rule, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In addition, the standard for evaluating antitrust claims is even more stringent. "[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). *See also Capital City Publishing Co. v. Trenton Times Co.*, 575 F.Supp. 1339, 1342 (D.N.J.1983).

However, as this court noted in *Garshman I*, courts have determined that "the heavy costs of modern federal litigation, especially antitrust litigation, and the mounting caseload pressure on the federal courts," militate in favor of requiring some reasonable particularity in pleading violations of the federal antitrust laws. *Sutliff, Inc. v. Donovan Co.*, 727 F.2d 648, 654 (7th Cir.1984). *See also Lombard's Inc. v. Prince Manufacturing, Inc.*, 753 F.2d 974, 975 (11th Cir.1985); *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 243–44 (6th Cir.1982); *In re Plywood Antitrust Litigation*, 655 F.2d 627, 641–42 (5th Cir.1981), *cert. dismissed*, 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983). "The pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts 'do not adumbrate' a violation of the Sherman Act, the plaintiffs

'will get nowhere merely by dressing them up in the language of antitrust.'" *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106–07 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985), *citing Sutliff, supra*, 727 F.2d at 654.

The court's task, therefore, is to sift through the allegations of Universal's crossclaim and determine whether the facts pleaded support Universal's contention that Transmission's conduct in seeking renegotiation of the 1981 agreement violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Even though the court must construe this complaint liberally, *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 903 n. 17, 74 L.Ed.2d 723 (1983), conclusory allegations which merely recite the litany of antitrust will not suffice. The court "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id. See also Broyer v. B.F. Goodrich Co.*, 415 F.Supp. 193, 198 (E.D.Pa. 1976).

#### B. Federal Antitrust Claims

#### 1. Count One: Monopolization

To state an adequate claim of monopolization under Section 2 of the Sherman Act, a plaintiff must allege (1) possession of monopoly power in the relevant geographic and product market, and (2) willful acquisition or maintenance of that power as distinguished from a justifiable business decision. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Universal contends that the relevant product market is the purchase and transportation of natural gas through interstate pipelines. Crossclaim, ¶ 16. The relevant geographic area is alleged to coincide with Transmission's interstate pipeline system, which extends through or reaches Kentucky, Maryland, New Jersey, New York, Ohio, Pennsylvania, Virginia, West Virginia and

the District of Columbia. For purposes of this motion to dismiss, the court will accept that market definition.

Universal alleges that Transmission and System possess monopoly power "in the purchase and interstate transportation of natural gas within the relevant geographical market." Crossclaim, ¶ 25. Although this conclusion is not supported by specific factual allegations, the court notes that Transmission and System are regulated as monopolies under the Natural Gas Act, 15 U.S.C. § 717 *et seq.* As this court observed in *Garshman I:*

> Government regulation does not automatically exempt an industry from the ambit of the antitrust laws. *Woods Exploration and Pro. Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1302 (5th Cir.1971). Indeed, the Supreme Court has said that "immunity from antitrust laws 'is not lightly implied.'" *United States v. First City National Bank,* 386 U.S. 361, 368 [87 S.Ct. 1088, 1093, 18 L.Ed.2d 151] (1967), *quoting California v. FPC,* 369 U.S. 482, 485 [82 S.Ct. 901, 903, 8 L.Ed.2d 54] (1962).
>
> To succeed under Section 2, a plaintiff must show that a regulated monopolist exercised power "to exclude competitors from ... trade or commerce among the several states...." *American Tobacco Co. v. United States,* 328 U.S. 781, 809 [66 S.Ct. 1125, 1138, 90 L.Ed. 1575] (1946). *See also Mid-Texas Comm. Sys., Inc. v. AT & T,* 615 F.2d 1372, 1387 (5th Cir.), *cert. denied,* 449 U.S. 912 [101 S.Ct. 286, 66 L.Ed.2d 140] (1980) (regulated monopoly liable under Section 2 if exclusionary conduct towards competitors shown).

*Garshman I,* 625 F.Supp. at 744.

The crossclaims allege that Transmission threatened Universal and other producers with severe economic reprisals and future refusals to deal if they refused to agree to price concessions in take or pay contracts:

In 1983, Universal and members of the class were notified by Transmission that Transmission intended to modify the price terms of the original gas purchase agreements. Universal and members of the class were informed that, if price concessions in favor of Transmission were not agreed to, they could expect severe economic reprisals. The threatened reprisals consisted of a severe reduction of their ability to sell gas, refusals to deal in future gas development on dedicated acreage of the Transmission contracts, arbitrary manipulation of pipeline pressure to keep the gas of Universal and members of the class from flowing and various other predatory and anticompetitive actions designed solely to frustrate their existing businesses. Beginning in 1984 and continuing thereafter to the present, Transmission fulfilled those threats and engaged in a continuous course of coercion against Universal and members of - the class which had the purpose and effect of preventing Universal and members of the class from fully developing their gas fields. This coercion also took the form of discriminatory pipeline access, with Transmission favoring those business entities that capitulated to its pricing demands. Transmission engaged in various other economic reprisals, the effect of which was to totally frustrate the business production of Universal and members of the class and their ability to raise capital for future exploration. Transmission also refused to authorize Universal and members of the class to sell their gas to other prospective purchasers either through Transmission's pipelines or via a connection to the pipeline of a competitor of Transmission. Crossclaim, ¶ 22.**

In its brief, Universal hypothesizes that Transmission has used its "market power to reduce the total output of natural gas by producers" and that "such output restrictions were undertaken by Transmission

** Universal has styled its crossclaim as a class action, although the class certification issue is not now before the court.

with the intent to increase the price paid by consumers for natural gas." Universal's Brief at 13. In addition, Universal theorizes that the "course of conduct by Transmission suggests an attempt to restrict the output of gas and to pass on its above-competitive market prices for that restricted output to consumers. Plainly, the economic injuries flowing from such conduct are the types with the antitrust laws are intended to prevent." *Id.* at 20.

■■■ Transmission contends, and the court agrees, that Universal's theory is inconsistent with and unsupported by the allegations of the crossclaims. Universal does not complain that Transmission undertook acts to reduce the total output of gas in the market, only that it undertook acts to reduce the prices Transmission pays for that gas. Crossclaim, ¶¶ 22, 26(a), 26(b), 26(e), 26(f). Any allegations that Transmission's acts threatened to and did reduce the output of particular producers are tied directly to allegations that Transmission attempted to reduce prices through the "coercion" of contract renegotiations. Based on the pleadings, the only motivations attributable to Transmission are (1) an intent to reduce the prices it pays to producers, *id.*, ¶¶ 22, 26(a), 26(b), 26(e), 26(f); (2) an intent to reduce its take-or-pay obligation by reducing prices, *id.*, ¶¶ 26(c), 26(d); and (3) an intent to retain all available gas under contract, *id.*, ¶ 26(g), 26(h). The crossclaims simply do not support an inference that Transmission sought to or did restrict total gas output in the market.

Universal also alleges that "Transmission has unlawfully maintained its monopoly power to fix, stabilize or set the price of natural gas in interstate commerce." *Id.*, ¶ 26(a). This claim demonstrates a naive misapprehension of the applicable regulatory scheme and the interplay of market forces which prompted Transmission to renegotiate its contracts. As noted above, Transmission's activities are regulated by the Federal Energy Regulatory Commission ("FERC"). The prices Transmission charges its customers are controlled by FERC and are derived primarily from Transmission's cost of gas—that is, from the prices it pays to producers. *See* 18 C.F.R. § 154.38(d)(4). Under the regulatory mechanism, Transmission passes through to its customers the costs it incurs in purchasing gas from producers. If the average price Transmission pays to producers is reduced, Transmission's gas costs are likewise reduced and prices to consumers go down. If prices paid to producers increase, costs and prices charged consumers increase accordingly. Even if Transmission were to restrict producers' output and create an artificial reduction in supply, prices to consumers would not rise unless Transmission paid correspondingly higher prices to producers for the gas.

Output restrictions have been held to be unreasonable restraints of trade because they interfere with the usual supply-demand relationship and drive prices higher. *See National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 2959–60, 2962–67, 82 L.Ed.2d 70 (1984) (citing cases). In this regulated industry, however, output restrictions could not have their typical effect on price.

■■■ When Transmission sought to renegotiate its onerous contractual commitments under take-or-pay arrangements, the industry was ailing. Transmission found itself with contracts to take or pay for gas in greater quantities and at higher prices than could be sold to distributors and endusers. *See Garshman I, supra,* 625 F.Supp. at 740. Transmission's contract price for its purchase of high-cost gas from producers like Universal became increasingly out of line with market price levels. *Id.; American Exploration, supra,* 779 F.2d at 313. Market prices had dropped sharply, and Transmission apparently attempted to minimize its exposure by renegotiating its take-or-pay contracts. The crossclaims' allegations are certainly sufficient to state a cause of action for breach of contract under state law. However, even if every allegation were proved, Transmissions' conduct could not have violated Section 2 of the Sherman Act. The

actions alleged neither excluded competitors, *American Tobacco Co., supra,* 328 U.S. at 809, 66 S.Ct. at 1138, nor suppressed supply in order to maintain a monopoly and to increase prices charged to consumers. Accordingly, the court finds that Universal's crossclaims fail to state a claim under Section 2 of the Sherman Act.

### 2. Conspiracy and Price Fixing

Universal alleges that "[System] and Transmission have entered into one or more agreements, contracts or conspiracies, and have engaged in concerted action with other entities, which agreements are in restraint of trade and are unreasonable," in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Crossclaim, ¶ 29.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States...." 15 U.S.C. § 1. The crossclaims' allegation of conspiracy is merely conclusory. Universal cannot base its claim on an alleged conspiracy between Transmission and System, because for purposes of Section 1, a parent cannot conspire with its subsidiary. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). As for the alleged conspiracies with "other entities," the allegation is too vague to stand. In the Third Circuit, a "mere general allegation of conspiracy is insufficient," *Kalmanovitz v. G. Heileman Brewing Co.,* 595 F.Supp. 1385, 1400 (D.Del.1984), *citing Black & Yates, Inc. v. Mahogany Assoc.,* 129 F.2d 227 (3d Cir.1942). "Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient." *Kalmanovitz, supra,* 595 F.Supp. at 1401. Merely adding unidentified participants—like "other entities"—does not provide defendants with adequate notice of Universal's conspiracy claim. *Sadler v. Rexair, Inc.,* 612 F.Supp. 491, 494 (D.Mont.1985) (conclusory allega-

tion of a conspiracy with "other debtors" fails to state a claim under Section 1). *See also Lombard's Inc. v. Prince Mfg., supra,* 753 F.2d 974, 975.

Universal contends that the "renegotiated" contracts constitute a form of contract in unreasonable restraint of trade. As discussed above in connection with the Section 2 claim, Universal pleaded no fact indicating that the renegotiations had a negative impact on competition.

Next, Universal alleges that defendants' actions "coerced a horizontal suppression of competition among producers which has deprived the public of the benefits of open and free competition and are thus per se illegal." Crossclaim, ¶ 33. Further, the defendants' acts allegedly represent agreement to fix, maintain or stabilize prices paid for natural gas and are *per se* illegal. *Id.,* ¶ 34. In *Garshman I,* the court examined similar contentions by the plaintiffs:

> The prevailing standard by which alleged Section 1 conspiracies are judged is the so-called "rule of reason". *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.,* 433 U.S. 36 [97 S.Ct. 2549, 53 L.Ed.2d 568] (1977). The essential principle behind the rule of reason is that "contractual restraints fall within the prohibition of Section 1 only when their purpose and effect is found to have imposed an undue restraint on commerce." *Sitkin Smelting [v. FMC Corp.] supra,* 575 F.2d [440] at 447 [3d Cir.1978]. Some restraints on commerce, however, are *per se* violations of the antitrust laws. *Northern Pacific Ry. v. United States,* 356 U.S. 1 [78 S.Ct. 514, 2 L.Ed.2d 545] (1958).
>
> The Supreme Court has held that "any combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se under § 1 of the Sherman Act." *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 [60 S.Ct. 811, 84 L.Ed. 1129] (1940). The Court has specifically condemned horizontal agreements among competitors to

fix prices and vertical resale price maintenance agreements. *See Pa. Dental Assn. v. Medical Serv. Assn. of Pa.*, 745 F.2d 248, 256 ([3d Cir.] 1984) (citing cases).

There is an important factual distinction between the case at bar and the typical vertical price fixing case: the prices allegedly fixed by the defendants are the price of the gas produced by Universal and the other producers and sold to [Transmission], not the resale price charged to third parties. "The price fixing within the scope of the per se prohibition of § 1, however, is an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves." *Sitkin Smelting, supra*, 575 F.2d at 446, *citing United States v. Parke, Davis & Co.*, 362 U.S. 29, [80 S.Ct. 503, 4 L.Ed.2d 505] (1960). As the Third Circuit Court of Appeals has noted, where the facts "differ greatly from the vertical arrangments to restrict resale prices invalidated in *Albrecht* [*v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968)] and [*Kiefer-Stewart Co. v. Joseph Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951)], we should be hesitant to condemn them under the per se rule." *Pa. Dental, supra* at 259.

The court concludes that the alleged acts taken to fix prices in the natural gas industry do not make out a *per se* violation of Section 1 of the Sherman Act. If the price fixing is not per se, the rule of reason applies. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, [38 S.Ct. 242, 243, 62 L.Ed. 683] (1918). "Essential to a finding of a § 1 violation is concerted action; unilateral action is not proscribed." *Pa. Dental, supra* at 255, *citing Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 [104 S.Ct. 1464, 79 L.Ed.2d 775] (1984).

The complaint alleges unilateral actions by [Transmission] which were taken to coerce the other defendants into accepting a lower price for their gas. Even if plaintiffs were able to prove every allegation, and even if the facts showed the existence of a coerced conspiracy, the court does not believe that the complaint states an actionable price fixing claim under Section 1. The alleged price fixing took the form of bilateral agreements, allegedly coerced by unilateral action. Furthermore, the purpose of the Sherman Act is to promote competition and facilitate the workings of a free market. Nothing in the complaint suggests that [Transmission] attempted to extort a below-market price through renegotiations. Indeed, the maximum lawful price allowable under the existing regulatory scheme was significantly in excess of the market price, given the tremendous oversupply stimulated by the enactment of the NGPA.

Accordingly, the court finds that the complaint does not allege facts sufficient to support a cause of action against [Transmission] under Section 1 of the Sherman Act.

*Garshman I, supra*, 625 F.Supp. at 743–44.

■ The same reasoning applies in the instant case. The court finds that Universal's crossclaim does not allege facts sufficient to support a cause of action against Transmission under Section 1 of the Sherman Act.

## C. State Law Claims

### 1. Choice of Law

■ Before the court can determine whether Universal's crossclaim states a cause of action under state law for breach of contract, duress or tortious interference, it must determine which state's law applies. State law issues arise most often in diversity cases, where a federal court must apply the choice of law principles of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1940). The instant matter is not a diversity case; the court has ancillary jurisdiction over Universal's crossclaim, which needs no independent jurisdictional basis. The court sees no reason, however, why it should not apply New Jer-

sey's choice of law rules to the state law issues raised by the crossclaim.

■■■ Absent a strong public policy dictating otherwise, New Jersey's courts ordinarily will apply the law of another state in deciding a question of construction or validity of a contract made and performed in that state. *Congress Factors v. Malden Mills Incorporated*, 332 F.Supp. 1384, 1390 (D.N.J.1971); *Jaclyn, Inc. v. Edison Brothers Stores, Inc.*, 170 N.J.Super 334, 348, 406 A.2d 474 (Law Div.1979). Universal is a Pennsylvania corporation with its principal place of business in New York. Transmission is a Delaware corporation with its principal place of business in West Virginia. The parties entered into the contracts at issue in New York. Those contracts contained no choice of law provision and concerned gas wells in western New York. New York's relationship to the contract is most significant. Therefore, this court will apply New York law to Universal's state law claims.

### 2. Count Three: Breach of Contract

Universal contends in Count Three that Transmission's actions, as enumerated in the crossclaim, constitute a breach of its contracts with Universal. Specifically, Universal alleges that Transmission's renegotiation efforts contravened its contractual obligation to pay the maximum lawful price for natural gas under the contracts and to take the volume of gas required by such contracts. Crossclaim, ¶ 36.

Universal's breach of contract claim is rooted in Transmission's alleged "coercion and duress." Crossclaim, ¶ 31. According to the crossclaim, Transmission breached its existing contracts by wielding its economic power arbitrarily and unfairly. In addition, Universal claims that the renegotiated contract it eventually signed was obtained by coercion and is therefore voidable and subject to recission.

Since this is a Rule 12(b)(6) motion to dismiss, the court must accept the crossclaim's factual allegations as true and determine whether it states a viable claim of duress. Under New York law, a claim of duress has four elements: (1) a threat; (2) unlawfully made; (3) that caused involuntary acceptance; (4) because the circumstances permitted no alternative. *Gulf & Western Corp. v. Craftique Prod., Inc.*, 523 F.Supp. 603, 610 (S.D.N.Y.1981); *Business Incentives Co. v. Sony Corp. of America*, 397 F.Supp. 63, 69–70 (S.D.N.Y. 1975).

■■■ To establish that contract acceptance was involuntary because the circumstances permitted no alternative, a party must show that "a breach of contract action would have been impossible when the threat was made." *Gulf & Western, supra*, 523 F.Supp. at 610; *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533, 535 (1971); *see Neuman v. Pike*, 591 F.2d 191, 194 (2d Cir.1979) (threatened breach of contract not duress when adequate legal remedies existed); *National Am. Corp. v. Federal Rep. of Nigeria*, 448 F.Supp. 622, 644–45 (S.D.N.Y.1978), *aff'd* 597 F.2d 314, 323 (2d Cir.1979) (no duress when plaintiff failed to pursue legal remedies for alleged breach).

■■■ Universal nowhere alleges that a breach of contract action would have been impossible or inadequate when Transmission "extorted" price concessions. Crossclaim, ¶ 26(e). Transmission first approached Universal about renegotiating their contracts in early 1983. Discussions continued until August 1984, when Universal agreed to renegotiate. Because Universal failed to pursue a legal remedy for alleged breach of contract then, its present claim for duress is inadequate as a matter of law. *See National Am. Corp., supra*, 448 F.Supp. at 644 (rejecting claim of duress because "plaintiff's legal remedy not only was available, but was ultimately pursued").

■■■ A "threat" is a necessary element of duress, and an announced intention to exercise a legal right cannot constitute a threat. *Printers, II, Inc. v. Professionals Pub., Inc.*, 615 F.Supp. 767, 772 (S.D.N.Y. 1985); *Business Incentives Co., supra*, 397

F.Supp. at 69. Transmission contends that by announcing that it would curtail its purchases and take other steps to reduce its "take" from Universal, it was merely exercising its contractual rights.

The original "take or pay" contract contained several provisions limiting Transmission's actual obligation to purchase and take gas during any given year. Section 6.1 provides that although Transmission promises to take all the gas the seller has available "insofar as it can consistently do so having regard for its other related interests ..."

> [I]t is further expressly understood and agreed that Buyer may restrict the flow or discontinue the taking of the gas temporarily, when and for such length of time as in its judgment it is deemed expedient so to do, Buyer's judgment being based upon consideration of market demand, its then existing pipeline facilities, the line pressure it deems necessary to maintain, and the competitive and other conditions in the various fields in which it is purchasing or producing gas.

In addition, Section 6.4 provides that "[i]t is recognized that Buyer may not be able to take and need not take gas from seller hereunder ... during any definite period," and Section 6.5 provides that so long as the volume of gas specified in the take or pay clause is taken or paid for, "all gas delivered hereunder may be taken in whatever manner and at such times as will best suit the convenience of the Buyer."

The Sixth Circuit Court of Appeals interpreted identical provisions in contracts between Transmission and other producers in *American Exploration Company v. Columbia Gas Transmission Corp.*, 779 F.2d 310, 312 (6th Cir.1985). The producers sought a preliminary injunction prohibiting Transmission from implementing a plan to purchase only 25 percent of the gas produced by their wells during 1985 under long term "take or pay" contracts identical to those with Universal. The district court denied injunctive relief because it found that the plaintiffs failed to demonstrate a

likelihood of success on the merits. The court found that Section 6.1 expressly allowed Transmission to discontinue taking gas for "such length of time as it deemed expedient" because of considerations of market demand. *Id.*, 779 F.2d at 313. The Sixth Circuit affirmed, noting that the contract empowers Transmission to curtail production "temporarily", with the length of any curtailment determined solely by Transmission's judgment. *Id.*

██ Even if Transmission did threaten to reduce the amount of gas it took from Universal, Transmission did not exceed its contractual authority. Similarly, even if Transmission increased the pressure in the pipeline to restrict Universal's access, Section 6.1 provides that Transmission shall decide "the line pressure it deems necessary to maintain." The "threats" alleged by Universal do not support a claim of duress as a matter of law.

### 3. Count Four: Indemnification

In Count Four, Universal seeks indemnification from Transmission for any legal liability to plaintiffs in the main action or other similarly situated claimants. Universal claims that Transmission's actions "were the direct, active and primary cause of damages sustained by the plaintiffs herein." Crossclaim, ¶ 43. The court will dismiss Universal's indemnity claim because neither plaintiffs nor Universal have stated a viable cause of action against Transmission, for the reasons stated in *Garshman I* and elsewhere in this opinion.

### 4. Count Five: Declaratory Judgment

The Fifth Count asserts that because of Transmission's "wrongful actions, including threats, coercion and breach of contract," the minimum termination date of Universal's contract should be extended for a period of time "equal to that period" during which Transmission "engaged in wrongful activities." Crossclaim, ¶ 51. For the reasons expressed elsewhere in this opinion, Universal has not shown that Transmission has engaged in any "wrong-

**1374**

ful activities" at all. Therefore, Count Five will be dismissed.

### 5. Count Six: Tortious Interference and Duress

█ The Sixth Count alleges that Transmission's actions constitute "duress and coercion" and "tortious interference with prospective economic advantage." Crossclaim, ¶ 54. For the reasons discussed in connection with the Third Count's breach of contract claim, the "duress and coercion" claim of this count will be dismissed. Universal's allegations of "tortious interference with contract rights" will likewise be dismissed because the only contracts identified in the crossclaim are those between Universal and Transmission, and a party "cannot be guilty of inducing the breach of [its] own contract." *Robbins v. Ogden Corp.*, 490 F.Supp. 801, 810 (S.D.N.Y.1980).

Universal claims that Transmission interfered with its "prospective economic advantage". The Restatement (Second) of Torts defines the tort of intentional interference with prospective contractual relations:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts, § 766B. New York's courts have recognized this tort. *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.E.2d 628, 406 N.E.2d 445 (N.Y.Ct.App. 1980); *Burns Jackson Miller Summit & Spitzer v. Lindner*, 88 A.D.2d 50, 452 N.Y.S.2d 80 (N.Y.App.Div.1982). To state a claim, the relationship must be specified, as well as the defendant's knowledge and intent. *Burns Jackson, supra.*

Universal nowhere alleges the existence of a prospective contractual relation that would have been entered into had it not been for Transmission's actions. *Robbins v. Ogden Corp.*, 490 F.Supp. at 811. In addition, Universal does not allege that Transmission knew that Universal had a prospective contract to sell gas to another buyer, or that Transmission intended to interfere with that prospect and injure Universal. Indeed, Universal contends that Transmission was motivated solely by its own "selfish economic interests." Crossclaim, ¶ 27. "[I]ntended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means [is not] actionable." *Robbins, supra,* 490 F.Supp. at 811.

Other jurisdictions also require that a defendant's conduct be characterized by the "absence of justification" as an element of this tort. *E.g. Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 n. 7 (1979). Universal has not even alleged that Transmission's actions were unjustified in light of changed market conditions. The Sixth Circuit's comment on Transmission's proposal to curtail certain producers' take under identical contracts fittingly describes Transmission's efforts to renegotiate its contracts with Universal:

[Transmission's action] ... at most constitutes an aggressive response to the failure of these commercially sophisticated parties to negotiate a solution to a change in market conditions of the risk of which both parties were well aware.

*American Exploration, supra,* 779 F.2d at 314.

█ Accordingly, the court finds that Count Six fails to state a claim and should be dismissed.

### IV. Universal's Motion for a Preliminary Injunction

After filing its crossclaims in October 1985, Universal moved for a preliminary injunction, seeking an order mandating that Transmission enter into contracts with Universal once the court strikes language which Universal considers unacceptable

and Transmission considers essential. The court held a hearing on this motion on December 9, 1985.

Universal asks the court to intervene on its behalf in contractual negotiations because Transmission allegedly is "attempting to use its market power over the transmission of natural gas to force Universal to accept contract language which will undermine the claims raised against it in this litigation by plaintiffs and Universal." Universal's Brief in Support of Motion for Preliminary Injunction, at 2. Specifically, Universal objects to language stating that a premium of 50 cents per MMBtu is "in consideration of [Universal's] renegotiations of certain existing agreements." Universal characterizes the disputed phrase as creating a "Hobson's choice." On the one hand, Universal claims that if it refuses to accept the contract on Transmission's terms, it will be unable to market its gas, will lose goodwill in the industry, and will inevitably be sued by its investors. If, on the other hand, it acquiesces, it will undermine its affirmative defense of duress and its crossclaim.

The contracts at issue on this motion contain similar, if not identical, provisions to the contracts renegotiated by Universal and Transmission in 1983 and 1984. However, they relate to different gas wells.

The court's decision today that Universal's crossclaim fails to state a viable cause of action under either the federal antitrust laws or theories of state laws renders further discussion of Universal's application for injunctive relief futile. To succeed on a motion for a preliminary injunction, the moving party must show, *inter alia*, a reasonable probability of success on the merits. *E.g. Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir.1980). Universal cannot succeed on the merits of a crossclaim which fails to state a claim on which relief can be granted. Therefore, Universal's application for preliminary injunctive relief will be denied.

## Conclusion

In summary, the court reaches the following results. System's motion to dismiss Universal's crossclaim for improper venue is granted. System's motions to dismiss the crossclaim on alternative grounds are rendered moot. System's motion to dismiss the amended complaint in the main action is also granted. Transmission's motion to dismiss the crossclaim for failure to state a claim is granted. Universal's motion for a preliminary injunction is denied.

The court will enter the appropriate order.